[Civ. No. 39165. First Dist., Div. Three. Oct. 1, 1976.]

HUGH J. DAVIS et al., Petitioners, v.
THE SUPERIOR COURT OF THE CITY AND COUNTY OF SAN
FRANCISCO, Respondent;
BRIDGET DENSBY, a Minor, etc., Real Party in Interest.

[Civ. No. 39166. First Dist., Div. Three. Oct. 1, 1976.]

THAD J. EARL et al., Petitioners, v.
THE SUPERIOR COURT OF SANTA CLARA
COUNTY, Respondent;
JUDITH ROWAN-GIGUETTE, Real Party in Interest.

[Civ. No. 39167. First Dist., Div. Three. Oct. 1, 1976.]

HUGH J. DAVIS et al., Petitioners, v.
THE SUPERIOR COURT OF CONTRA COSTA
COUNTY, Respondent;
PATRICIA FORD et al., Real Parties in Interest.

[Civ. No. 39360. First Dist., Div. Three. Oct. 1, 1976.]

THAD J. EARL et al., Petitioners, v.
THE SUPERIOR COURT OF SANTA CLARA
COUNTY, Respondent;
KAREN WERNER, Real Party in Interest.

**COUNSEL**

Landels, Ripley & Diamond, Thomas W. Kemp and Bruce W. Laidlaw for Petitioners.

No appearance for Respondents.

Conklin, Davids & Friedman, Dennis B. Conklin and Jay R. Mayhall for Real Parties in Interest. Di Giorgio, Davis & Klein and N. Thomas McCartney as Amici Curiae on behalf of Real Parties in Interest.

## OPINION

**DRAPER, P. J.**—Each of the petitions before us seeks writ of mandate to require the trial court to quash service of summons upon some of the petitioners. (Code Civ. Proc., § 418.10, subd. (c).) Each petitioner is among the defendants named in each of the basic actions (in some counties more than one) from which this dispute arises. These basic actions all seek damages for personal injuries allegedly resulting from defects in an intrauterine contraceptive device known as the Dalkon Shield. No petitioner is a resident of California and none was personally served in this state. In the San Francisco and Contra Costa County cases, the motion to quash was granted as to some defendants but denied as to all three petitioners (Lerner, Earl and Davis). In the two proceedings arising in Santa Clara County, the motion was granted as to Davis, but denied as to Lerner and Earl. The several grants of relief are not before us, since those orders are directly appealable (1 Witkin, Cal. Procedure (2d ed. 1970) Jurisdiction, § 133, subd. (5)) and are not the subject of any petition here.

By statute "[a] court of this state may exercise jurisdiction on any basis not inconsistent with the Constitution of this state or of the United States." (Code Civ. Proc., § 410.10.) The Senate Judiciary Committee in recommending adoption of this section declared the comments of the Judicial Council (Judicial Council of Cal. Annual Rep. (1969) p. 27 et seq.; 14 West's Ann. Code Civ. Proc., p. 459 et seq.) reflect its intent in approving the measure.

Petitioner Davis, a doctor of medicine and resident of Maryland, originated the idea of the Dalkon Shield. He discussed his idea with petitioner Lerner, an engineer and a resident of Connecticut. The two designed the device. Lerner patented it in his own name. The Dalkon Corporation was formed, with Lerner and Davis as major shareholders. In April 1970, petitioner Earl, a doctor of medicine who resides in Arizona, acquired a 7½ percent interest in the corporation. In June 1970, the patent of the shield was assigned to A. H. Robins Co., a codefendant in all the basic actions, but not a movant to quash. All three petitioners received payment, proportionate to their interests in Dalkon Corporation, for this assignment of the patent. In addition, they shared 10 percent royalty payments on sales of the shield by Robins. Robins contracted to employ all three petitioners as consultants for substantial annual salaries over varying periods of years.

■ We have little difficulty in finding petitioners Lerner and Earl to be subject to California jurisdiction in these actions for damages for personal injuries sustained through use of the shield. Lerner was employed by Robins as a consultant from 1970 to 1974. There is evidence that he assisted Earl in the operation of "technical booths" all over the United States to promote this shield. In September 1970, he attended the San Francisco convention of the American Academy of General Practice and operated a commercial exhibit in which the shield was advertised to physicians and order forms were available. In 1971, he attended the San Francisco convention of the American College of Obstetricians and Gynecologists. He asserts that he was merely a "visitor and observer" and "in no way connected with the Dalkon Shield or A. H. Robins Co." But, as the San Francisco court found, "it is difficult to understand why an engineer would attend [such a convention] unless he was there in his 'consulting' capacity or because of his self-interest arising from his royalty percentage."

Petitioner Earl was employed by Robins from 1970 to 1973 as a consultant at $30,000 per year. He received a share of the payment by Robins for the patent, and a share of royalties from gross sales by that firm. He developed a film on the shield which was assigned to Robins for use in promoting the shield to the medical community generally. At the 1970 convention of the American Academy of General Practice, in San Francisco, he conducted a "scientific booth" where he showed the film and spoke to doctors about the advantages of the shield. Although Earl did not accept orders at that booth, Lerner accepted them at the nearby "technical booth." In 1972, Earl conducted a "scientific display" at the American Medical Association convention in San Francisco. Although he says he did not accept orders for the shield at this time, a technical booth at the same convention did accept orders.

■ "A state has power to exercise judicial jurisdiction over an individual who has done . . . an act in the state with respect to any cause of action in tort arising from such act, . . ." (Judicial Council of Cal., Annual Rep., *supra,* Appendix II (p. 77), and authorities there cited; *National Life of Florida Corp.* v. *Superior Court,* 21 Cal.App.3d 281 [98 Cal.Rptr. 435].) ■ Petitioner Earl on two occasions, and petitioner Lerner on at least one, came to California to conduct promotional campaigns for sale of the shield. These activities were directed to doctors, many obviously from this state, who are essential intermediaries in the sale and insertion of the shield. The promotion thus was designed to effect sales at

the conventions and, more importantly, to build a continuing California market for the shield. It is clear that such conduct within California, performed by two men who sought financial benefits from sales of the shield, constitutes "an act by which" petitioners purposely availed themselves of "the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws" (*Hanson* v. *Denckla,* 357 U.S. 235, 253 [2 L.Ed.2d 1283, 1298, 78 S.Ct. 1228]).

■ As to Dr. Davis, the issue is somewhat closer. He performed, in California, no act of sale or promotion of the device, and jurisdiction over him must rest upon the effects in this state of his acts elsewhere.

As indicated above, the original idea for the Dalkon Shield was his. He received a share of Robins' payment for the patent. He was employed by Robins as a consultant for five years at $20,000 per year. In addition, he received from $300,000 to $400,000 as his share of royalties upon gross sales by Robins. In 1970, he published in the American Journal of Obstetrics and Gynecology an article on "The Shield Intrauterine Device." In that year, California subscribers to that medical journal numbered 1,385. In 1971, he published a book "Intrauterine Devices for Contraception." It was distributed throughout the United States and a number of copies were sold in California. Reprints of the journal article and of excerpts from the book were made by Robins and were available in the "technical booths" at the two California conventions as well as in other states. Dr. Davis sent copies to physicians inquiring about the Dalkon Shield. Robins' ads in medical journals circulated in California and elsewhere contained reference to Davis' article and book. He denies any part in the sales or advertising efforts of Robins. But a piece of Robins' advertising copy bears a handwritten note "Keep for file to record changes made by Dr. Davis." A Robins' employee identified petitioner as the Dr. Davis referred to in this note. This evidence strongly supports the inference, drawn by the trial court, that Robins' use of his material in its advertising generally, including that in California, was with his knowledge and consent, and that his employment as consultant included some participation in the advertising campaign. His substantial financial interest in Robins' sales indicates a personal interest in promoting such sales in the nation's most populous state.

■ "A manufacturer engages in economic activity within a state as a matter of 'commercial actuality' whenever the purchase or use of his

product within the state generates gross income for the manufacturer and is not so fortuitous or unforeseeable as to negative the existence of an intent on the manufacturer's part to bring about this result." (*Buckeye Boiler Co.* v. *Superior Court,* 71 Cal.2d 893, 902 [80 Cal.Rptr. 113, 458 P.2d 57], and cases there cited.) A designer is equally subject to jurisdiction of the forum state for faulty design made and drawn elsewhere (see *Jones Enterprises, Inc.* v. *Atlas Service Corporation* (9th Cir. 1971) 442 F.2d 1136, 1139-1140). *Jones* held the designer, T. Y. Lin & Associates, subject to jurisdiction upon the same basis as the general contractor and the supplier of materials.

Petitioners rely heavily upon a decision (*Taylor* v. *Portland Paramount Corp.* (9th Cir. 1967) 383 F.2d 634), asserting that they, like Taylor, did not participate in "distribution." But *Portland Paramount* sought damages from Taylor because her alleged conduct with one Burton, wholly outside Oregon, assertedly decreased attendance at a motion picture in which the two had leading roles, and for the distribution of which Portland Paramount held the Oregon franchise granted by Twentieth Century-Fox Film Corp. The court held that the Fox negotiations in Oregon were not acts of Taylor. As to the tort claim, the court held that she had not "purposefully availed herself of the privilege of conducting activities within Oregon, . . . while disporting herself with Burton in various parts of Europe, merely because it was expected that Fox would contract for the showing of [the motion picture] in Oregon . . ." (p. 642). Here, on the contrary, jurisdiction is premised upon the personal and active participation of petitioners in the promotion of California sales of a defective product. "Distribution," in the narrow sense urged by petitioners and applicable in the film exhibition agreement involved in *Taylor,* is not an issue or a requisite to jurisdiction in the cases at bench.

The trial courts of San Francisco and Contra Costa were amply justified, on the record before them, in concluding that petitioner Davis, for his own gain, participated in the advertising and promotion campaign of Robins knowing that it was to be directed to the state affording the largest market for the product. Although his acts occurred elsewhere, they necessarily submit him to the jurisdiction of California in the basic actions asserting personal injuries to California residents from use of the device of which he was a co-designer and the California sales of which he fostered and promoted.

■ Petitioners Lerner and Earl similarly caused effects in California by their actions elsewhere, and as to them this is an additional ground for jurisdiction.

In light of our conclusion that petitioners Lerner, Earl and Davis all are subject to jurisdiction of California courts in these basic actions, trial court refusal to quash service of summons as to any or all was proper.

Peremptory writs of mandate are denied, and the alternative writs heretofore issued are discharged.

Brown (H. C.), J., and Scott, J., concurred.

Petitioners' application for a hearing by the Supreme Court was denied November 24, 1976.