[Civ. No. 25386. Fourth Dist., Div. Two. June 17, 1981.]

CIRCUS CIRCUS HOTELS, INC., Petitioner, v.
THE SUPERIOR COURT OF ORANGE COUNTY, Respondent;
JAMES B. HAYNIE, JR., et al., Real Parties in Interest.

548

COUNSEL

Roper & Folino and Michael J. Irwin for Petitioner.

No appearance for Respondent.

R. M. Cantillon for Real Parties in Interest.

OPINION

McDANIEL, J.—The broad question presented for decision is whether the Orange County Superior Court has jurisdiction to entertain a tort action against a Nevada hotel corporation. The suit was brought by California residents and arose out of the hotel's alleged negligence as the proximate cause of the loss by theft or mysterious disappearance of plaintiffs' personal property from their hotel room in Las Vegas. Because the offending events causing plaintiffs' loss occurred solely in Nevada, the narrower question to be resolved is whether the Nevada hotel corporation, under applicable constitutional standards of due process, enjoyed sufficient contacts with California such that to allow the California action to proceed would not offend "traditional notions of fair play and substantial justice."[1] Those contacts consisted of the hotel's substantial and regular advertising in the Los Angeles Times and the maintenance of a so-called "800" telephone number which readers of the advertising could use without cost to themselves to call the hotel and make reservations.

After the complaint was filed by the Haynies, the defendant Circus Circus Hotels, Inc., appeared specially for the purpose of moving to quash service of summons upon it. Such motion was based both upon a claimed absence of in personam jurisdiction (Code Civ. Proc., § 410.10) and an inconvenient forum (Code Civ. Proc., § 410.30). The trial court denied the motion, and defendant petitioned us for a writ of mandate to redress the error assigned, i.e., denial of the motion. After argument following issuance of the alternative writ, we directed the trial court to vacate its order and to grant the motion. The plaintiffs petitioned for rehearing, which we granted, and, after further argument, the matter is once again before us for disposition.

The plaintiffs, a husband and wife and their 21-year-old son, all residents of Orange County, California, along with 2 other sons, minors, took a recreational trip to Nevada in the early winter of 1980. After visiting the Mt. Charleston ski area, the family "by majority vote" decided to spend a night in Las Vegas. The parents in turn decided that the Circus Circus Hotel would be a good place to stay because "two of

---

[1] *Internat. Shoe Co. v. Washington* (1945) 326 U.S. 310, 316 [90 L.Ed. 95, 101-102, 66 S.Ct. 154, 161 A.L.R. 1057].

our three sons were underage and [that hotel] offered attractions and games for minors . . . ."[2]

The family did stay at the Circus Circus Hotel, and during the first night there their room was burglarized. As a result, the plaintiffs claimed to have lost cash and personal property, including jewelry and a mink coat.

After returning to Orange County, the plaintiffs filed suit there against the hotel, alleging negligence of the hotel as the reason for the theft or mysterious disappearance of their property. The complaint sought recovery of $7,100 compensatory damages for the property loss plus $10,000 exemplary damages. Yet otherwise, plaintiffs alleged "because of the matter complained of herein, and the anguish visited the plaintiffs and because of the losses they sustained, plaintiffs cut short their excursion at a cost to plaintiffs Jas. B. and Henrietta Haynie of at least $1,500, all to these plaintiffs' additional damages in this sum ($1,500 total)."

As it relates to the issue raised by these original proceedings, the complaint also alleged, "Defendants, at all times herein mentioned, advertise their said business in newspapers and other publications in the State of California including the counties of Los Angeles and Orange, and employ other methods of advertisement in California and within said counties; defendants know, therefore, or should know, that many of their Californian guests sojourn to and stay over within their said hotel facility (as was the case with plaintiffs) as a direct or indirect result of this publicity."

As previously noted, after the complaint had been filed and the defendant hotel served personally in Nevada, it appeared specially and moved to quash that service for the reason that the California court had no personal jurisdiction over it and, if the court did, that it was nevertheless an inconvenient forum.

SUMMARY OF FILINGS IN SUPPORT OF THE MOTION

In support of its motion, the defendant filed the affidavit of Carl E. Lovell, Jr., the secretary-treasurer of the defendant corporation. Ac-

---

[2]The quotation is from the declaration of James B. Haynie, Jr., filed in opposition to the motion to quash.

cording to Lovell's affidavit, defendant Circus Circus Hotels, Inc., is a Nevada corporation with its principal place of business in Las Vegas, its business is the operation of hotels and casinos in Las Vegas and Reno, Nevada, and it does not own or operate any hotels or casinos in California or in any other state besides Nevada.

Further, according to the Lovell affidavit, the defendant has never filed its articles of incorporation with the Secretary of State of the State of California; neither has it designated any person residing in California upon whom process may be served. Likewise, per the affidavit, the defendant never has filed with the Secretary of State of the State of California its irrevocable consent to such service or to service of process upon it by the Secretary of State.

The Lovell affidavit further shows that the alleged tortious conduct complained of by the plaintiffs occurred at 2880 Las Vegas Boulevard South, Las Vegas, Nevada. It also shows that defendant, at the time of the incidents referred to in the complaint, did not own any real or personal property in California, did not lease or maintain any office, residence or place of business in California, and did not have any agents in California.

From the Lovell affidavit it also appears that the defendant at no time ever had any bank accounts in California; neither did it ever own stock of any kind in California. The affidavit also states that the defendant has never paid any income taxes or any real property taxes in the State of California. The affidavit concluded with the statement that defendant has never conducted any business in California.[3]

---

[3]In our initial opinion we dropped a footnote with reference to Mr. Lovell's affidavit, noting that at oral argument counsel for plaintiffs, with considerable emotion, had denounced Mr. Lovell as having lied when he averred in his affidavit that defendant did not do business in California. In our earlier footnote we also recounted that also at oral argument counsel, to support his accusation, held up for the court to see a newspaper ad for the Circus Circus Hotel appearing in a then current issue of the Los Angeles Times. Counsel emphasized that the ad was in color and proclaimed portentously that such advertising appeared regularly in the Los Angeles Times and represented expenditures of many thousands of dollars. The accusation that Mr. Lovell had lied in his affidavit was vigorously and colorfully reiterated in the petition for rehearing.

Nevertheless, this record shows, in one manner of speaking, that the ultimate *legal* issue in this case is whether the hotel was doing business in California in such a way as to permit in personam jurisdiction constitutionally to attach. Therefore, Mr. Lovell's statement, which has so agitated Mr. Cantillon, at most is either redundant advocacy or is the innocuous recitation that the defendant operated no hotels in California. In any event, we certainly are not going to decide the issue solely upon such a self-serving statement, which, in this context, must necessarily be viewed as only a legal conclusion.

SUMMARY OF FILINGS IN OPPOSITION TO THE MOTION

In opposition to the motion, the plaintiffs filed the declaration of plaintiff James B. Haynie, Jr., a Californian by birth and by his own assertion a "natural US citizen."

The declaration contains much folksy detail about the Haynies' trip to Las Vegas,[4] about its unfortunate consequences, and about why they concluded that it was the defendant's fault that their room was burglarized. It also explains that his "present atty. has been my attorney and my family's atty. for about 15 years and we definitely do not want to go to the trouble of locating and hiring a Las Vegas attorney and paying more attorney's fees, court costs and sheriff expenses. In fact, neither I nor Mrs. Haynie know a Las Vegas or Nevada attorney and our own lawyer tells me that the only one he knew died about 2 or 3 years ago (John McNamee)." The declaration concludes indignantly by stating that "[d]uring my stay at this hotel or upon checking out I paid $103.05 [three nights] for the room but under protest, also with money I had earned in California."

However, with reference to factual circumstances arguably relevant to the constitutional inquiry into the trial court's in personam jurisdiction or lack of it, the declaration points to the extensive advertising done by the defendant in the Los Angeles Times. Copies of a representative sampling of such advertisements are attached as exhibits to the declaration. In this regard, the declaration states, "For a number of

---

[4]"We arrived on the premises of Circus Circus late that same afternoon (Friday, the 11th) and I engaged room 1319 together with a roll-away bed (the room had two beds in it already).

"My cash funds upon departing Orange County were from $700 to $900 and my wife had about $150 to $200. The three boys had their own spending money although both I and my wife expected to be called upon for their financial assistance.

"All of us had dinner as a group that evening, in Circus Circus and we then split up since I and my wife wanted to try out [*sic*] luck in the casino. However, our luck proved not too good; I believe I lost from $300 to $400 and Mrs. Haynie about $100 or $150. She went to room 1319 at about midnight and I at about 2 a.m. on Sat., the 12th of January (1980). Since I was the last to enter I made sure the door to our room was locked.

"Quite early that morning our children planned to take the motorhome and go skiing and wanted money for ski-lift tickets. It was then that we discovered our losses, which were reported both to the hotel and the Las Vegas Metropolitan Police Department.

"The money stolen was earned by me in California; all personal property missing was acquired by myself, my wife and my son James in California and paid for with monies earned in California. My wife and I also had missing about $40 in Circus Circus gambling chips which were either purchased or won with money acquired the same way."

years I have purchased the Los Angeles Times on Sundays. In 1979 and on 1/5/80 I read several ads run therein by Las Vegas hotels and casinos, usually appearing on the first two pages of the classified section, in the *Calendar* and in the funnies. In so doing I often saw the defendant's advertisements. While the exhibits attached hereto are subsequent to January 12, 1980, like ads appeared in the LA Times, on Sunday, throughout 1979 and earlier this year; my lawyer tells me that defendant has admitted advertising in California and maintaining an 800 telephone # available at no charge to California residents."

After referring to particular kinds of ads which appeared in the Los Angeles Times on specific dates, all many months *after* the events alleged in the complaint, the declaration states, "On 11/24/80[5] I placed a telephone call to Phyllis Shannon of [the] LA Times, Orange County office, 957-2000. I was informed that a like ad printed in the funnies would cost $2,332 per Sunday and the square ad, $816.20. The ads appearing in the funnies are in color (black, white, blue, yellow and red.)"[6]

## DISCUSSION

Before proceeding to a resolution of the particular issue noted at the outset, i.e., whether the defendant, under applicable constitutional standards of due process, enjoyed such minimal contacts with California that to allow the California action to proceed would offend traditional notions of fair play and substantial justice, we deem it imperative to spell out precisely the factual predicate upon which we shall construct our analysis of applicable precedents.

Both in their return to the initial petition and in their petition for rehearing, the plaintiffs are categorically insistent that the trial court, in denying the motion to quash, made *a finding of fact* that the defendant

---

[5]The alleged tortious conduct occurred on *January* 11-12, 1980, and so the trial court had no figures before it relative to any expenditures by the defendant for advertising before the plaintiffs' fateful trip. In this connection, although we are here only passing upon the propriety of the trial court's denial of the defendant's motion to quash, the real parties, in their return to the initial petition, have introduced a substantial amount of new factual material, not before the trial court, purportedly demonstrating the nature and extent of the hotel's advertising in the Los Angeles Times.

[6]This comports with plaintiffs' counsel's colorful presentation at the first oral argument.

hotel was doing business in California with the result that we are not at liberty to review, let alone reverse, that determination. Such insistence ignores that the presentations to the trial court involved no disputed issues of fact. As a consequence, the trial court was confronted only with a question of law, and, institutionally it is our function to review the trial court's disposition of that legal question.

We repeat, there was no dispute about the extrinsic, observable facts presented to the trial court and which provide the basis for our analysis. The defendant, through a Nevada agency, caused substantial and regular amounts of advertising of its hotel, its gambling facilities, and attendant entertainment features to be placed in the Los Angeles Times and, inferentially, in other California newspapers. It is also fair to infer that the reason for such advertising was to induce Californians to come to the Circus Circus Hotel in Las Vegas and to spend their money there. While it is unclear whether the hotel's use of the Nevada advertising agency was a fact argued before the trial court, such fact having only been revealed by the plaintiffs on the written record in their return filed with us, our analysis proceeds upon the assumption, as implied by the record of Los Angeles Times' billings to the BPL Advertising Co. in Las Vegas, that no representatives of the defendant ever set foot in California to contract for the California newspaper advertising. The issue to be resolved then is whether such advertising, in conjunction with the "800" telephone number maintained by the defendant, represented sufficient contacts with California to confer in personam jurisdiction over defendant in the California courts for the adjudication of alleged wrongs *suffered by the plaintiffs exclusively in Nevada* while traveling there solely for recreational purposes.

I

■ In commencing our discussion in the initial opinion, we observed, "The law to be applied in resolving the issue of jurisdiction over defendant is governed by statute in California. Section 410.10 of the Code of Civil Procedure states: 'A court of this state may exercise jurisdiction on any basis not inconsistent with the Constitution of this state or of the United States.' As a consequence, any effort by a California court to exercise in personam jurisdiction over a nonresident, as here, is a matter controlled by the due process clause of the Fourteenth Amendment to the United States Constitution" as construed both by our Supreme Court and by federal decisions. Such is still our view.

However, plaintiffs in their petition for rehearing argue that cases decided before the effective date of Code of Civil Procedure section 410.10, i.e., July 1, 1970, are of no precedential value. Such argument wholly ignores the legislative history of this section. We refer plaintiffs to the extensive comment made by the Judicial Council appearing in the annotations appended to section 410.10 (14 West's Ann. Code Civ. Proc. (1973 ed.) pp. 459-483) which makes clear that the purpose of the recitation in the new section, that jurisdiction may be exercised on any basis not inconsistent with the Constitution, was to bring such exercise into congruence with existing constitutional precedents in the field. In the introduction to the comment it is declared, "This authorization [Code Civ. Proc., § 410.10] *continues* the California law on jurisdiction over foreign corporations and *reestablishes* the prior law that once governed nonresident individuals." (*Id.* at p. 459; italics added.)

If there were any doubt concerning the legislative intent as here confirmed by the Judicial Council comment, to lay that doubt at rest, reference need only be made to the portion thereof devoted to the subject of foreign corporations doing business in the forum state. There, the cases cited, including the leading cases of *McGee* v. *International Life Ins. Co.* (1957) 355 U.S. 220 [2 L.Ed.2d 223, 78 S.Ct. 199]; *Perkins* v. *Benguet Mining Co.* (1951) 342 U.S. 437 [96 L.Ed. 485, 72 S.Ct. 413]; *Travelers Health Assn.* v. *Virginia* (1950) 339 U.S. 643 [94 L.Ed. 1154, 70 S.Ct. 927]; and *Internat. Shoe Co.* v. *Washington, supra*, 326 U.S. 310, were *all* decided well before the effective date of present Code of Civil Procedure section 410.10.

From the foregoing we conclude that our analysis and resolution of the issue can properly include any authorities on this subject, at least since *International Shoe.*

## II

Under the statute noted, a California court may exercise jurisdiction over nonresidents on any basis not inconsistent with the United States or California Constitutions. This section manifests an intent to exercise the broadest possible jurisdiction, limited only by constitutional considerations. (*Sibley* v. *Superior Court* (1976) 16 Cal.3d 442, 445 [128 Cal.Rptr. 34, 546 P.2d 322].) Moreover, as a general constitutional principle, a court may exercise personal jurisdiction over a nonresident individual so long as he has such minimal contacts with the state that

the maintenance of the suit there is reasonable in that it does not offend traditional notions of fair play and substantial justice. (*Cornelison* v. *Chaney* (1976) 16 Cal.3d 143, 147 [127 Cal.Rptr. 352, 545 P.2d 264].)

 In providing guidelines for the application of these now fundamental principles, *Cornelison* points out, that "If a nonresident defendant's activities may be described as 'extensive or wide-ranging' [citation] or 'substantial ... continuous and systematic' [citation], there is a constitutionally sufficient relationship to warrant jurisdiction for all causes of action asserted against him. In such circumstances, it is not necessary that the specific cause of action alleged be connected with the defendant's business relationship to the forum. [Citing *Perkins* v. *Benguet Mining Co., supra*, 342 U.S. 437, 447-448 (96 L.Ed. 485, 493-494).]" (*Id.* at p. 147.)

 Alluding to a contrasting situation, the court goes on to say that, "If, however, the defendant's activities in the forum are not so pervasive as to justify the exercise of general jurisdiction over him, then jurisdiction depends upon the quality and nature of his activity in the forum in relation to the particular cause of action. In such a situation, the cause of action must arise out of an act done or transaction consummated in the forum, or defendant must perform some other act by which he purposefully avails himself of the privilege of conducting activities in the forum, thereby invoking the benefits and protections of its laws. Thus, as the relationship of the defendant with the state seeking to exercise jurisdiction over him grows more tenuous, the scope of jurisdiction also retracts, and fairness is assured by limiting the circumstances under which the plaintiff can compel him to appear and defend. [Fn. omitted.] The crucial inquiry concerns the character of defendant's activity in the forum, whether the cause of action arises out of or has a substantial connection with that activity, and upon the balancing of the convenience of the parties and the interests of the state in assuming jurisdiction. [Citing *Hanson* v. *Denckla* (1958) 357 U.S. 235, 250-253 (2 L.Ed.2d 1283, 1295-1298, 78 S.Ct. 1228).]"[7] (*Id.* at pp. 147-148.)

---

[7]In *Hanson*, a Pennsylvania domiciliary executed an *inter vivos* trust naming a Delaware trust company as trustee. She subsequently moved to Florida where she executed a will and exercised her power of appointment in the trust. After her death in Florida, beneficiaries under the will brought suit in Florida to have the trust declared invalid. The five-judge majority opinion held that Florida had no jurisdiction over the Delaware trustee, whose contacts with Florida primarily consisted of remitting trust income to the settlor in Florida and making changes in the instrument at the request of the settlor while she was in Florida.

In sum, historically, as recounted in *Cornelison*, there have evolved two particular kinds of circumstances in which to apply the guiding proposition of reasonableness first stated in *International Shoe*. These derive from the locus of events out of which the controversy arose. ■ If the plaintiff's claim derives from defendant's activities or events occurring *within the forum*, or having a causal impact within the forum, the plaintiff must establish only that the defendant had minimal contacts with the forum state in order to invoke, permissibly, its in personam jurisdiction. Representative of such circumstances is *Buckeye Boiler Co.* v. *Superior Court* (1969) 71 Cal.2d 893 [80 Cal.Rptr. 113, 458 P.2d 57].

Contrastingly, if plaintiff's claim does not arise from defendant's activities occurring *within* the forum state, i.e., the litigation provoking transaction occurred elsewhere, then the test of jurisdiction depends on the extent of defendant's activities in the forum state *otherwise*. According to *Cornelison*, a case illustrating the latter circumstance is *Koninklijke L.M.* v. *Superior Court* (*KLM*) (1951) 107 Cal.App.2d 495 [237 P.2d 297].

Beyond the two circumstances noted, *Cornelison* imports a third. In *Cornelison*, in a wrongful death action brought by a California resident against a Nebraska resident arising out of a vehicular collision in Nevada, the trial court granted the nonresident's motion to quash and dismissed the action. On appeal, the Supreme Court reversed. It saw as significant that the defendant had been engaged, for seven years before the collision, in the business of hauling goods by truck in interstate commerce, making perhaps as many as twenty trips a year into California. The offending transaction actually occurred near the California border while the defendant was on a haul to deliver goods to a California consignee. This trip also included defendant's expectation of loading in California a return cargo to an undesignated destination. In addition, defendant was licensed by the State of California to haul freight within its borders, and he had acted as independent contractor for a California brokerage firm engaged in freight shipping.

After reciting the general rules above noted as applied to these facts, Justice Mosk, writing for the *Cornelison* court, concluded that the defendant's activities in California were not sufficiently substantial or wide ranging as to justify what was characterized as a general jurisdiction over him, as for instance was determined to obtain in *KLM* and

*Perkins.* Nevertheless, *Cornelison* went on to hold, because a substantial nexus was demonstrated between defendant's California related activities and plaintiff's cause of action, that there existed a reasonable basis to inquire further into whether the exercise of jurisdiction would be reasonable. (*Cornelison v. Chaney, supra*, 16 Cal.3d 143, 149.)

The *Cornelison* court then states, "It is true that, because the accident occurred across the state line in Nevada, the connection is not as direct as in cases such as *McGee v. International Life Ins. Co., supra*, 355 U.S. 220, 223. However, we cannot overlook the fact that defendant's contacts with California, although insufficient to justify general jurisdiction over him, are far more extensive than those of the defendant in *McGee*. [Fn. omitted.] The question of jurisdiction cannot be decided by the application of some precise formula. The seminal case of *Internat. Shoe Co. v. Washington, supra*, 326 U.S. 310, 319 . . ., pointed out that it is not a question whether the defendant's activity within the state 'is a little more or a little less.' The court there rejected a rigid test in favor of a flexible approach grounded in the quality and nature of the activity of the defendant in the state seeking to exercise jurisdiction over him, fairness to the parties, and the orderly administration of the law. Under this principle, the exercise of jurisdiction over defendant [in *Cornelison*] would not violate the dictates of due process *if the factors of convenience discussed below weigh in plaintiff's favor.* [Fn. omitted.]" (*Cornelison v. Chaney, supra*, 16 Cal.3d 143, 149-150; italics added.)

▮ From this exposition it is indicated by *Cornelison* that it is now possible, where the offending events occur *outside* California and even where there are *insufficient* contacts between the nonresident defendant and California to justify the exercise of a general jurisdiction, as in *KLM*, that jurisdiction may nevertheless be invoked where there exists that "substantial nexus between plaintiff's cause of action and defendant's activities in California" (*id.* at p. 149), provided that exercise does *not* result in such inconvenience to the defendant in defending the action away from home, determined by a kind of balancing process, as to constitute a violation of due process. (*Id.* at p. 150.)

Although transcending purely geographic factors in weighing the jurisdictional question, the *Cornelison* court nevertheless preserved the two-step analysis alluded to in a different geographic context in *Buck-*

*eye Boiler* v. *Superior Court, supra*, 71 Cal.2d 893, 899.[8] That is to say, the court first inquired if a *substantial nexus* existed between the extra-forum transaction and the defendant's forum-related activities. Having decided that such nexus did exist, it went on to a balancing of convenience factors. "Following these two steps, the court in [*Cornelison*] concluded its analysis of the relation between the defendant's forum contacts and the plaintiff's cause of action by asserting that due process would be met if the balancing process came out in plaintiff's favor. [Fn. omitted.] Thus the first step, the analysis of contacts, was nondeterminative: whether the contacts were such as to make the exercise of jurisdiction fair could not be determined without going on to consider convenience factors." (Note (1977) 65 Cal.L.Rev., *supra*, 257, 263.)

## III

With these principles in mind, we turn to the facts underlying the defendant's motion to quash. Defendant is a Nevada corporation which owns and operates hotels and casinos exclusively in Nevada. It has made none of the official overtures to the State of California which would qualify it to do business here or to appoint an agent for acceptance of service of process. It owns no property here, has no office here, and maintains no bank accounts or agents here. It has never paid any taxes here.

Otherwise, the defendant has committed no act or omission which evoked any effect in California having a causal connection with the plaintiffs' burglary loss suffered in Nevada. In other words, it *cannot* be said that *but for* defendant's advertising in California the burglary would not have taken place.

Parenthetically, before proceeding with our application of the legal propositions noted to the undisputed facts of the case before us, it is necessary to invoke another. In their opposition to the motion, in their return to the writ petition and in their petition for rehearing plaintiffs urge as significant a variety of facts representing their own status and activities. For instance, they attach legal significance to the fact that they are California residents and that their marital domicile is here. In their return they declare, "It is not denied that the real parties

---

[8]In preserving this two-step mode of analysis, *Cornelison* provoked a certain criticism from at least one commentator. (See Note (1977) 65 Cal.L.Rev. 257, 262-266.)

gambled away from $400 to $550 of their own money, which James B. Haynie, Jr. had earned in California, and ran up a bill of $103.50 which James B. Haynie, Jr., paid, with money also earned in California. Or that a motor vehicle registered in California burning gasoline purchased in California brought them to Las Vegas." Such items are irrelevant to the issue. It is only the defendant's activities within the forum state which are significant in deciding the question of jurisdiction. (*Floyd J. Harkness Co.* v. *Amezcua* (1976) 60 Cal.App.3d 687, 691 [131 Cal.Rptr. 667].) As stated in *Harkness*, "In examining the quality and nature of the activities in this state, it is settled that we are not concerned with the performance of the plaintiff in California but exclusively with the nonresident defendant's activities in this state. It is the latter activities which must provide the basis for jurisdiction. [Citing *Cornell University Medical College* v. *Superior Court* (1974) 38 Cal.App.3d 311, 316 (113 Cal.Rptr. 291).]" (*Id.* at pp. 691-692.)

■ Turning finally to the relevant facts before the trial court and where they fall on the spectrum, in terms of the several propositions discussed, it is of course at once evident that this is not a case of the *Buckeye Boiler* type, i.e., where the alleged tortious conduct occurred in California or had a causal effect here. In this connection, we can pass as inapposite certain cases relied upon by plaintiffs, including *Davis* v. *Superior Court* (1976) 62 Cal.App.3d 484 [133 Cal.Rptr. 115]. In *Davis*, the alleged tortious conduct of the nonresident defendants had physical effects on the plaintiffs in California (the Dalkon Shield cases), and hence can be rationalized and classified under *Buckeye Boiler*, although the *Davis* court did not cite the former.

The other cases variously relied upon by plaintiffs, i.e., *Thos. P. Gonzalez Corp.* v. *Consejo Nacional de Produccion de Costo Rica*, (9th Cir. 1980) 614 F.2d 1247, *Ratcliffe* v. *Pedersen* (1975) 51 Cal.App.3d 89 [123 Cal.Rptr. 793], *Belnap Freight Lines Inc.* v. *Petty* (1975) 46 Cal.App.3d 159 [119 Cal.Rptr. 907], *Hadler* v. *Western Greyhound Racing Circuit* (1973) 34 Cal.App.3d 1 [109 Cal.Rptr. 502], and *Martin* v. *Detroit Lions, Inc.* (1973) 32 Cal.App.3d 472 [108 Cal.Rptr. 23], do not involve tortious conduct. With the exception of *Belnap*, involving a quiet title action here and a related probate proceeding in Utah, all arose from alleged breaches of contract. While certain language found in these cases may be arguably of general application to the case before us, such language is really not useful to an analysis of the issue because it is difficult to say just where a breach of contract occurs when the

case is between a resident promisee and a nonresident promisor. Accordingly, notwithstanding the diluting of such factor by *Cornelison*, we are of the view that the geographic factor, as a useful tool of analysis should be retained in some measure in determining jurisdiction in tort cases if for no other reason than that the precedents have evolved in a kind of symmetry by reliance upon such factor.

Turning then to the alternative inquiry, the alleged tortious conduct *having occurred exclusively in Nevada*, was the defendant doing business in California to such an extent as to justify the existence of a general in personam jurisdiction over it as occurred in *KLM*? In searching for the answer to this inquiry, it is germane to the analysis at this point to recall the affidavit of Mr. Lovell. Laid alongside the facts in *KLM*, where the deaths and alleged tortious conduct occurred in England and where the defendant airline maintained a technical office in California to facilitate its yearly purchase of over $1 million worth of aircraft from California manufacturers, the facts of the case here bear no similarity to those in *KLM* in terms of California contacts.

However, plaintiffs, pointing to the Judicial Council comment appended to Code of Civil Procedure section 410.10 (14 West's Ann. Code Civ. Proc. (1973 ed.) *supra*, pp. 459-483), direct our attention to a recitation occurring under one of several tabulated bases of judicial jurisdiction over individuals, namely: "(7) Doing Business in State." (*Id.* at p. 459.) The recitation appearing later under that heading reads, "A state has power to exercise judicial jurisdiction over a non-resident individual who does business in the state with respect to causes of action that do not arise from the business done in the state if this business is so continuous and substantial as to make the exercise of such jurisdiction reasonable." (*Id.* at pp. 468-469.) We suggest, if resort is to be made to this comment, that we would be better advised to treat with those portions devoted to jurisdiction over *foreign corporations*. Under item (5) of that portion of the comment concerning jurisdiction over corporations it is stated, "A state has power to exercise judicial jurisdiction over a foreign corporation which does business in the state with respect to causes of action that do not arise from the business done in the state if this business is so continuous and substantial as to make it reasonable for the state to exercise such jurisdiction." (*Id.* at p. 480.) For this proposition the comment cites *Perkins* v. *Benguet Mining Co., supra*, 342 U.S. 437, and *Fisher Governor Co.* v. *Superior Court* (1959) 53 Cal.2d 222, 225 [1 Cal.Rptr. 1, 347 P.2d 1], as representative. *Perkins* ruled in favor of jurisdiction; *Fisher Governor* ruled against. Parenthetically, in

our initial opinion, where we held there was no California jurisdiction, we were of the view that *Fisher Governor* was dispositive.

After the citations noted, the Judicial Council comment adds, "slight contacts required if cause of action arises within the state; more contracts [*sic*] required where the action has no relation to this state." (*Id.* at p. 480.) As further authority, the comment cites *Jeter v. Austin Trailer Equipment Co.* (1953) 122 Cal.App.2d 376, 389 [265 P.2d 130], and *Koninklijke L.M. v. Superior Court, supra,* 107 Cal.App.2d 495, 499.) Both decisions ruled in favor of jurisdiction. *KLM* has already been alluded to; *Jeter* involved a suit in California against a Michigan corporation arising out of an Arizona accident allegedly caused by a defective automotive part manufactured by the defendant corporation and purchased by the plaintiff *in California.* The facts otherwise showed, during a particular year preceding the accident, that the defendant corporation's sales *in California* amounted to approximately 10 percent of its entire gross sales. The result appears obvious.

Plaintiffs pursue their argument that defendant was doing business in California by reason of its extensive advertising in the Los Angeles Times by quoting further language from the Judicial Council comment. "[D]oing business is the doing of a series of similar acts for the purpose of thereby realizing pecuniary profit, or otherwise accomplishing an object, or doing a single act for such purpose with the intention of thereby initiating a series of such acts." (*Id.* at p. 480.) In efforts to apply this definition to the facts here, plaintiffs in their return argue, "If Circus Circus does not do business with the *Times* and *Herald-Examiner* in Los Angeles, California, what does it do with them?"

"Doing business" is necessarily a shorthand designation of a *legal conclusion* which attaches at the end of a detailed analysis of what actually happened. Granted, the placing of advertising in the California newspapers represented a series of commercial transactions, but the issue is whether those transactions legally constituted the contacts necessary to make it constitutionally permissible to invoke in personam California jurisdiction over this Nevada corporation.

Simply stated, the defendant was engaged, by means of advertising, directed at a substantial number of California residents, in promoting its Nevada-based hotel, gambling, and entertainment business. By such promotion, it sought to induce recreational sojourners to come from California to Nevada in furtherance of its Nevada business. When one

of these sojourners suffered injury because of the allegedly tortious conduct of the recreational operator who had advertised in the forum state, were there facts enough upon which to predicate in personam jurisdiction?

After all of the rules already discussed have been recited, their application to a given set of facts remains essentially a policy choice. Even so, such choices must be responsive to precedent.

This brings us back to *Fisher Governor Co.* v. *Superior Court, supra,* 53 Cal.2d 222. In *Fisher Governor*, the plaintiffs brought personal injury and wrongful death actions in California, the offending events having occurred in Idaho where a gas meter and pressure reducing station exploded, allegedly because of defective manufacture by the defendant Iowa corporation. The opinion adds, "Although Fisher's principal offices and manufacturing plants are in Iowa and it has no employees or property in California and has not appointed an agent to receive service of process here, plaintiffs contend that Fisher's sales activities in this state are sufficient to subject it to the jurisdiction of our courts even if the causes of action are not related to those activities. Fisher's products are sold in California through independent manufacturers' agents who also sell similar products of other manufacturers. These agents receive commissions on sales made of Fisher's products and provide Fisher's catalogues to interested persons on request. Fisher is listed in telephone books at the agents' addresses and numbers." (*Id.* at p. 224.)

On these facts, the Supreme Court in *Fisher Governor* ruled that there was no California jurisdiction over the Iowa corporation. In support of its decision, the court said, "Although a foreign corporation may have sufficient contacts with a state to justify an assumption of jurisdiction over it to enforce causes of action having no relation to its activities in that state [citations], *more contacts are required for the assumption of such extensive jurisdiction than sales and sales promotion within the state by independent nonexclusive sales representatives.* [Citations.]" (*Id.* at p. 225; italics added.)

This exact quote can be traced forward to *Archibald* v. *Cinerama Hotels* (1976) 15 Cal.3d 853, 864 [126 Cal.Rptr. 811, 544 P.2d 947], which credited it to *Vibration Isolation Products, Inc.* v. *American Nat. Rubber Co.* (1972) 23 Cal.App.3d 480, 483-484 [100 Cal.Rptr. 269], where an order quashing service of summons was affirmed. In writing

for the latter court, Justice Kingsley invoked the *Fisher Governor* rationale, "'To hold otherwise would subject any corporation that promotes the sales of its goods on a nationwide basis to suit anywhere in the United States without regard to other considerations bearing on "the fair and orderly administration of the laws which it was the purpose of the due process clause to insure." (*International Shoe Co.* v. *Washington, supra*, 326 U.S 310, 319; . . . Accordingly, we must look beyond defendant's sales activties [*sic*] in this state to determine whether jurisdiction may constitutionally be assumed.'" (*Id.* at p. 484.)

In *Archibald*, the plaintiff, a California resident who had booked reservations in a Hawaiian hotel through an American Express office in Sacramento, undertook to sue the hotel in California for alleged discriminatory rates charged to visitors from the mainland. A motion to quash by the hotel was granted by the trial court, and, although the supporting affidavits were determined on appeal to be inadequate to establish the predicate for such order, the proposition above quoted was nevertheless recognized by the Supreme Court to be the law applicable.

The *Archibald* court went on to say "An analogy occurs in *Kenny* v. *Alaska Airlines*, 132 F.Supp. 838. There a federal court held that the defendant airline was not 'doing business' in California by selling tickets through ticket agencies or connecting carriers. The court suggested that subjection to jurisdiction through ticket sales by local carriers or independent contractors 'would present a policy problem of such magnitude that we believe the California courts would hold that such ticket sale activities did not constitute doing business.' (132 F. Supp. at p. 852.) In *Miller* v. *Surf Properties*, 4 N.Y.2d 475 [176 N.Y.S.2d 318, 151 N.E.2d 874], the New York Court of Appeals held that the activities of an independent New York travel agency, which solicited business and received reservations for many hotels, including a Florida hotel, did not make the Florida hotel amenable to New York process." (*Id.* at pp. 864-865.)

The analogy between *Fisher Governor* and the case before us is substantial. *Fisher Governor* relied upon several nonexclusive manufacturers' agents in California to advertise and sell its products. Here, the defendant utilized several California newspapers, which carried advertising for many others, to promote its Nevada business. Our case here is actually a *weaker* case for ruling in favor of jurisdiction when compared to *Fisher Governor*, for the defendant here made no sales in California.

From the foregoing it can be fairly concluded that it is the law in California that sales and sales promotion by nonexclusive agents or independent contractors in the forum state have not been characterized as "doing business" so as to extend jurisdiction to a foreign corporation which retained the services of the nonexclusive agents or independent contractors for these purposes in the forum state. It logically follows, therefore, that merely advertising in the forum state, together with maintaining an "800" telephone number there, confers no general in personam jurisdiction on the forum state to try the culpability of the advertiser's allegedly tortious conduct occurring elsewhere.

Even so, we feel it necessary to note in passing *Florence Nightingale School of Nursing, Inc.* v. *Superior Court* (1959) 168 Cal.App.2d 74 [335 Cal.Rptr. 240], which appears to reach a contrary result and relies heavily on *Travelers Health Assn.* v. *Virginia, supra,* 339 U.S. 643. In both of those cases, there was solicitation of business by a foreign corporation in the forum state. As a result of such solicitation, residents of the forum state entered into contractual relationships with the soliciting parties. In the litigation which followed, the defendants' challenges to jurisdiction were unavailing, and it was ruled that the solicitation plus contracting amounted to doing business in the forum state.

These decisions are readily distinguishable. In our case here, there was no direct business or commercial contact taking place between the parties in California, and there was no rendering of a service here by defendant. Again, we suggest that the use of breach-of-contract cases is seldom helpful for applying generic-type rules in deciding the issue of jurisdiction in tort cases.

In sum, concluding this phase of the analysis, we are satisfied that the facts of this case fall far short of those in *Perkins* and *KLM* for purposes of invoking general California in personam jurisdiction. In other words, in terms of the Judicial Council comment noted, the defendant was not "doing business" in California to such an extent as to bring it within the parameters of *Jeter* v. *Austin Trailer Equipment Co., supra,* 122 Cal.App.2d 376, 389, which the comment pointed to as illustrative of the concept.

This conclusion is amply supported by authority from other jurisdictions involving business solicitations in the forum state followed by tort-related happenings in the state of the nonresident defendant to which the solicitation attracted the plaintiffs. Such cases include

*Scheidt* v. *Young* (3d Cir. 1968) 389 F.2d 58, *Turner* v. *Jack Tar Grand Bahama, Ltd.* (5th Cir. 1965) 353 F.2d 954, *Jacobs* v. *Lakewood Aircraft Serv., Inc.* (E.D.Pa. 1980) 493 F.Supp. 46, *Sanders* v. *Wiltemp Corp.* (S.D.N.Y. 1979) 465 F.Supp. 71, *Baird* v. *Day & Zimmerman, Inc.* (S.D.N.Y. 1974) 390 F.Supp. 883, and *Braasch* v. *Vail Associates, Inc.* (N.D.Ill. 1973) 370 F.Supp. 809.

## IV

It remains only to measure the defendant's activities, claimed by the plaintiffs to invoke California jurisdiction over defendant, against the final test prescribed by *Cornelison.* In other words, having decided, as did the *Cornelison* court, that there was no general jurisdiction over the defendant, we must yet proceed with the two-step test which first inquires whether there is a substantial nexus between plaintiffs' cause of action and defendant's activities in California. As a guide in seeking the answer to this inquiry, the *Cornelison* court admonishes, "If, however, the defendant's activities in the forum are not so pervasive as to justify the exercise of general jurisdiction over him [which we have held], then jurisdiction depends upon the quality and nature of his activity in the forum in relation to the particular cause of action. In such a situation, the cause of action must arise out of an act done or transaction consummated in the forum, or defendant must perform some other act by which he purposefully avails himself of the privilege of conducting activities in the forum, thereby invoking the benefits and protections of its laws." (*Cornelison* v. *Chaney, supra*, 16 Cal.3d 143, 147-148.)

This language lays down alternative sets of circumstances which, if either is satisfied, would provide the "substantial nexus" between the plaintiffs' cause of action and the defendant's activities in California sufficient to satisfy the first step of the *Cornelison* two-step test. In their return, plaintiffs argue, "The petitioner has advertised in California, in two newspapers alone, to the tune of $127,177.13 in a period of 25 months (appreciably over $1000 per week). Can the petitioner's lawyer say this is all the advertising it does in this state (instead of 'I don't know'; he could surely find out between now and April 7)? Let him tell us also (by then) how much his client pays for the 800 number in California. But even these known promotional activities of the petitioner should be sufficient to find personal jurisdiction. That they were directly related to the loss cannot be doubted by fair and reasonable minds. The ads asked the Haynies to travel from California to Nevada and hire one of its sleeping rooms (even the rates appear in the ads time

after time). And this is exactly what the Haynies did, they reacted to the advertisement in precisely the manner hoped for by Circus Circus. [¶] The loss which befell them was not unique, unusual or freakish.... It was ... a very common crime, integrally related with a hotel's ordinary operation and business of letting rooms for seasons of repose, and valuables totalling in the millions of dollars are lost to guests each year in the United States. Now, bear in mind that this same hotel, spent (so far as is presently known to the real parties) $127,177.13 in scarcely over two years, with two prominent California newspapers known to have great circulation in Orange County ... in order to get the plaintiffs to take a room within it. And also supplied the plaintiffs with an 800 number to facilitate the operation. Yet, this same inn-keeper, admitting all of the above, takes the surprising position that these same people cannot now sue it for this calamity in their own court, but must go out of state to do so. It wasn't out-of-state advertising which the plaintiffs read, that got them there."

Giving this argument the best of all possible interpretations with reference to the two *Cornelison* "nexus" criteria, we cannot say that plaintiffs' burglary loss arose "out of an act done or transaction consummated in the forum." (*Cornelison v. Chaney, supra,* 16 Cal.3d 143, 148.) The acts or omissions of defendant alleged to be the proximate cause of the loss were the failure to rekey the lock to room 1319 and failure to warn plaintiffs of the 'earlier burglary of that very room. It could not be seriously contended that the defendant's advertising was the proximate cause of the burglary, i.e., that the burglary would not have happened *but for* the advertising.

We turn then to the other of the two criteria, namely, that "defendant must perform some other act by which he purposefully avails himself of the privilege of conducting activities in the forum, thereby invoking the benefits and protection of its laws." (*Id.* at p. 148.) We recall, in *Cornelison,* that the defendant Chaney, a resident of Nebraska, regularly used the highways of California in his interstate trucking business and was actually licensed in California for such purpose. Thus, Chaney availed himself of certain benefits of the forum state. In our case here, the defendant could hardly be said to have availed itself of any benefits afforded by the State of California, let alone sought protection of its laws. Defendant purchased advertising in California newspapers, a service paid for and rendered without any involvement of the forum state's laws or public facilities. Accordingly, we are well satisfied, under a literal application of the two *Cornelison* "nexus" criteria,

that the first hurdle of the *Cornelison* test has not been cleared. It is therefore unnecessary to proceed to the second which would measure, by means of a balancing procedure, the relative inconvenience to defendant if it were required to appear and defend in California.

However, if we are to give the plaintiffs' theory of jurisdiction thorough consideration, it is necessary to pursue the *Cornelison*-type analysis yet further. This final consideration is suggested by *Spirits, Inc.* v. *Superior Court* (1980) 104 Cal.App.3d 918 [164 Cal.Rptr. 918]. In *Spirits*, a California resident was injured in Arizona when a bottle of Pepsi-Cola she had purchased in Arizona exploded in her hand, injuring her, also in Arizona. In the ensuing California action, the trial court declined to quash service of summons upon the defendant Arizona retailer who had sold plaintiff the offending bottle of Pepsi-Cola. On petition for writ of mandate by the defendant, the Court of Appeal directed the trial court to grant the motion to quash service of summons on the defendant.

*Spirits* is of arguable interest to plaintiffs here because they here have in effect urged application to their facts of the "commercial actuality" test as discussed in *Buckeye Boiler*[9] and urged in *Spirits*. Because the defendant retailer in *Spirits* was located on the Colorado River adjacent to California and derived substantial economic advantage as a matter of commercial actuality from trade with California residents resulting from the retailer's location, the plaintiff in *Spirits* urged the application of the concept of commercial actuality, renamed "economic reality," as the basis for deeming the defendant's sales in Arizona as having in legal effect occurred in California. Impliedly, this in turn

---

[9]To quote the *Buckeye Boiler* court, "In *Fisher Governor, supra*, we intimated that a nonresident manufacturer 'purposefully' conducts activities within the forum state, within the meaning of *Hanson*, if it 'knowingly inject[s] itself into a transaction ... having substantial California contacts related to the causes of action.' (53 Cal.2d at p. 226.) In *Empire Steel Corp.* v. *Superior Court, supra*, 56 Cal.2d 823, 834 [17 Cal. Rptr. 150, 366 P.2d 502], we recognized that an enterprise 'obtain[s] the benefits and protection of our laws' if, 'as a matter of *commercial actuality*, [it] has engaged in economic activity within this state....' (Italics added.) According to *Hanson*, the requirement that the defendant engage in purposeful activity within the forum state is designed to demonstrate that the defendant has invoked such benefits and protection and is *therefore* amenable to jurisdiction in at least some cases (357 U.S. 235, 253 [2 L.Ed.2d 1283, 1297].) Thus, we have equated engaging in economic activity within this state 'as a matter of commercial actuality' with *Hanson's* requirement of purposeful activity within the state. [Citation.]" (*Buckeye Boiler Co.* v. *Superior Court, supra*, 71 Cal.2d 893, 901-902.)

would allow jurisdiction to attach without offending traditional notions of fair play and substantial justice. (*Id.* at pp. 922-923.)

■ Translated into the facts of the case before us, the argument implied by the plaintiffs runs like this. It is a "commercial actuality" or an "economic reality" that California residents, in response to the advertising in California newspapers, will, in large, readily foreseeable, numbers, flock to Las Vegas to patronize the advertiser's business there. As a result, because the defendant advertiser profits substantially from this foreseeable "commercial actuality," it would not offend traditional notions of fair play and substantial justice to deem the offending events to have occurred in California and to require the defendant advertiser to answer in the courts of California for the consequences of its torts suffered by its California patrons, constructively in California, although literally in Nevada.

Justice Kingsley in *Spirits*, rejects such argument out of hand. He writes, "This position [commercial actuality or economic reality], absent actual injury occurring within the forum, has never been accepted by any California opinion. There are, moreover, reasons why it should not be now accepted, as such an extension of the parameters of jurisdiction would subject every merchant in every border city and in every tourist area to actions brought by nonresident tourists who suffer injury during their interstate travels and bring action when they return to their home state." (*Spirits, Inc. v. Superior Court, supra*, 104 Cal.App.3d 918, 924.)

Plaintiffs venture the argument in their return that the result in *Spirits* would have been different had the Arizona retail liquor store "run Sunday ads in a California newspaper exceeding $3000 for each publication, carrying an 800 toll-free number encouraging the reader (that is, the plaintiff) to either call and/or go to Arizona to buy Spirits' Pepsi-Cola." We think not. The reasons given by Justice Kingsley for refusing to extend the "commercial actuality" or "economic reality" theory to out-of-state tort cases have nothing to do with the nature and extent of the persuasion which lures the Californians into a neighboring state to their eventual dismay. Moreover, plaintiffs have provided us with no compelling reason to do so except their own inconvenience in having to go to Nevada to pursue their remedy against the defendant hotel. As already explained, under *Cornelison* the balancing of the convenience of the parties only becomes a consideration if the "nexus" is first determined to exist. Relying on *Spirits*, on the undisputed facts be-

fore the trial court, we hold that "commercial actuality" or "economic reality" does not provide a "substantial nexus" between plaintiffs' cause of action and defendant's advertising activities in California such as to confer jurisdiction over defendant in California.

## V

■ To summarize, it is an obvious corollary to *Fisher Governor* that sales and travel promotion activities within this state, either through agents or by advertising, including use of an "800" telephone number, do not, without more, operate to confer in personam jurisdiction over a nonresident defendant instituting such activities, where the plaintiff *seeks to recover in California from such defendant for a grievance occurring in the course of recreational activities wholly outside the forum state*, even though the plaintiff's sojourn outside the forum state was in response to such promotional activities. As a consequence, in the case before us, the trial court improperly refused to grant the motion to quash service of summons on the defendant Nevada corporation.

### DISPOSITION

Let a peremptory writ of mandate issue to the Superior Court of Orange County in civil No. 342280 directing it to vacate its order denying defendant's motion heard December 18, 1980, and to enter a new and different order granting the motion of defendant Circus Circus Hotels, Inc., to quash service of summons upon it herein. The alternative writ is discharged.

Gardner, P. J., and Tamura, J., concurred.