[No. A014819. First Dist., Div. Three. Apr. 30, 1985.]

RICE GROWERS ASSOCIATION OF CALIFORNIA, Plaintiff and Appellant, v.
FIRST NATIONAL BANK OF MINNEAPOLIS et al., Defendants and Respondents.

COUNSEL

Joseph L. Alioto, Joseph M. Alioto, John I. Alioto, Patricia Sturdevant and Alioto & Alioto for Plaintiff and Appellant.

Michael Brooks Carroll, Scott H. Miller, Carroll, Weller & Haines, Charles Lee Eisen, Robert C. Eager, Kirkpatrick, Lockhart, Hill, Christopher & Phillips, Vincent O'Gara, Gilmore F. Diekmann, Joan Irion Thompson and Bronson, Bronson & McKinnon for Defendants and Respondents.

**OPINION**

**ANDERSON, J.**\*—This is an appeal from the trial court's orders granting motions to quash service of process for lack of personal jurisdiction and/or for improper venue.

The litigation at hand revolves around the construction of an allegedly defective ocean-going vessel built elsewhere, but primarily used in California. Plaintiff, Rice Growers Association of California (hereafter RGA or appellant), is a California agricultural cooperative corporation with its principal place of business in West Sacramento, California. RGA, which is comprised of approximately 2,000 rice growers throughout California, deals in the milling, processing and marketing of California rice in both domestic and foreign commerce. Defendants to the action are several California and out-of-state corporations. The California defendants are: DeLaval Turbine, Inc. (DeLaval); Bulk Food Carriers, Inc. (BFC); Intercoastal Bulk Carriers, Inc. (IBC); Security Pacific Leasing Corporation (Security Pacific); and Crocker National Bank (Crocker). The nonresident defendants are: First National Bank of Minneapolis (FNB); Connecticut Bank and Trust Company (CBT); Breit Engineering, Inc. (Breit); Southern Shipbuilding Corporation (Southern); and Maryland Shipbuilding & Drydock Company (Maryland Shipbuilding). DeLaval's principal place of business is Oakland, California, and its primary business is the manufacture of diesel powered engines, including ones used in ocean-going vessels and tugboats. BFC's principal place of business is San Francisco, and its primary business is to own, charter and operate ocean-going barges. IBC is a wholly owned subsidiary of BFC with its principal place of business in San Francisco. Security Pacific and Crocker are California banks which are also engaged in owning and leasing equipment, including tugboats and barges.

Outside of California defendant FNB is a national banking association, with its principal place of business in Minneapolis, Minnesota, whose business involves not only banking, but also owning and leasing equipment, including tugboats and barges; CBT is a Connecticut banking corporation, dealing with banking and trust matters; Southern is a Louisiana corporation engaged in constructing ocean-going tugboats and vessels; Maryland Shipbuilding is also a shipbuilder with its principal place of business in Baltimore; and lastly, Breit, a Louisiana corporation with its principal place of

---

\*Assigned by the Chairperson of the Judicial Council.

business in New Orleans, Louisiana, is a designer of ships providing professional naval architect services.[1]

Since the 1960's RGA had shipped approximately 100,000 tons of rice per year from Sacramento, California, to San Juan, Puerto Rico. In 1972 BFC approached RGA with a proposal to build a new ship, an integrated tug-barge combination vessel which would have greater cargo capacity, greater speed and better fuel economy than the previous rice-carrying ship, named *Rice Queen*. As a result of an initial understanding between the two, in November 1972 BFC proceeded with the project and contracted with Breit to design an integrated tug-barge vessel (hereafter "Valerie F") which had a 25,000 dwt cargo capacity, configured to carry lumber, bulk liquid chemical, phosphate rock and rice; developed 16 kph speed and propelled by diesel engines capable of burning heavy fuel. In January 1973 BFC entered into a contract with DeLaval for the construction of two diesel powered engines fit for "Valerie F." In August 1973 IBC, a wholly owned subsidiary of BFC, contracted with Southern to build the tug portion of the ocean-going vessel at a contract price of $4,565,000. In September 1973 IBC entered into a contract with Maryland Shipbuilding for the construction of the barge portion of the vessel for the price of $10.4 million.

In November 1973 FNB, Security Pacific and Crocker entered into an owner participation agreement whereby they agreed to invest at least $19.8 million in the ownership of the "Valerie F." This agreement specifically

---

[1]For easy reference we summarize the defendants as follows:

A. *California corporations*:

| Name | Abbr. | Headquarters | Function |
|---|---|---|---|
| DeLaval Turbine, Inc. | (DeLaval) | Oakland | Engine Manufacturer |
| Bulk Food Carriers, Inc. | (BFC) | San Francisco | charterer |
| Intercoastal Bulk Carriers Inc. (subsidiary of BFC) | (IBC) | San Francisco | charterer |
| Security Pacific Leasing Corporation | (Security Pacific) | San Francisco & Los Angeles | bank, lessor of equipment |
| Crocker National Bank | (Crocker) | San Francisco | bank, lessor of equipment |

B. *Nonresident corporations*:

| Name | Abbr. | Headquarters | Function |
|---|---|---|---|
| First National Bank of Minneapolis (Respondent) | (FNB) | Minneapolis, Minn. | bank, equitable owner of vessel |
| Connecticut Bank and Trust Company (Respondent) | (CBT) | Hartford, Conn. | bank trustee, legal owner |
| Breit Engineering, Inc. (Respondent) | (Breit) | New Orleans, La. | designer of vessel |
| Southern Shipbuilding Corporation (Respondent) | (Southern) | Slidell, La. | builder of tug |
| Maryland Shipbuilding & Drydock Company | (Maryland Shipbuilding) | Baltimore, Md. | builder of barge |

contemplated that the vessel would be chartered by a California corporation. In addition, the owner participants entered into a second contract, i.e., an "Owner Trust Agreement" with CBT. Under the latter contract CBT agreed to own and charter the "Valerie F" as a trustee for the benefit of FNB and the two California banks.

In the wake of the above agreements CBT, on behalf of the owner participants, contracted with IBC[2] whereby the banks agreed: (a) to become the owners of the vessel and charter it to IBC for 15½ years; (b) to take an assignment and novation of the construction contracts set out above; (c) to assume the obligation of IBC to oversee and supervise the construction of the "Valerie F"; (d) to purchase the vessel for $30.8 million; and (e) to receive the tax benefits therefrom (i.e., investment tax credit, accelerated depreciation, capital gain treatment, and the like). It was likewise agreed that after delivery IBC would charter the "Valerie F" to RGA and that RGA guaranteed the rental payments IBC owed to the banks over the period of the charter.

The tugboat was delivered and accepted by the president of IBC as an agent for CBT on December 30, 1976, and was then chartered to RGA. The ensuing use of the vessel by RGA, however, showed that the "Valerie F" did not fulfill the purpose for which it was constructed inasmuch as it could not carry the cargo load which was contemplated, nor could it develop the requisite speed or burn the heavy fuel oil as set out in the plans and specifications.

Based upon these facts, RGA brought a suit against the above-named defendants alleging causes of action, inter alia, for breach of contract, breach of express and implied warranty, negligent construction and negligent supervision. Following the filing of the first amended complaint defendants FNB, CBT, Southern and Breit (hereafter respondents) moved to quash the service of process for lack of personal jurisdiction.[3] The trial court granted the motions without stating the reasons therefor and dismissed the complaint against respondents.[4]

Appellant's principal contention on appeal is that due to substantial contacts and massive commercial involvement with California, respondents are

---

[2] In September 1973 BFC assigned the Breit and the DeLaval contracts to IBC and thereafter IBC carried on the project in place of BFC.

[3] FNB moved to quash service of process also for lack of venue pursuant to the United States Code (12 U.S.C. § 94).

[4] On the eve of oral argument appellants' motion to dismiss its appeal against respondents Southern and Breit was filed and denied by the court. (See 6 Witkin, Cal. Procedure (2d ed. 1971) Appeal, § 450, pp. 4410-4411.)

subject to personal jurisdiction in this state and as a consequence the quashing of the service of process against respondents was prejudicially erroneous. For the reasons which follow we agree with appellant and reverse the orders.

### BASIS FOR EXERCISING JURISDICTION

Under the long-arm statute, Code of Civil Procedure section 410.10, a California court may exercise jurisdiction over a nonresident defendant on any basis not inconsistent with the United States or California Constitutions. This section manifests an intent to exercise the broadest possible jurisdiction, limited only by constitutional considerations. (*Sibley* v. *Superior Court* (1976) 16 Cal.3d 442, 445 [128 Cal.Rptr. 34, 546 P.2d 322].) As a general constitutional principle, a court may exercise personal jurisdiction over a nonresident defendant as long as the defendant has such minimum contacts with the forum that the maintenance of the suit does not offend the " 'traditional notions of fair play and substantial justice.' " (*Internat. Shoe Co.* v. *Washington* (1945) 326 U.S. 310, 316 [90 L.Ed. 95, 102, 66 S.Ct. 154, 161 A.L.R. 1057]; *Secrest Machine Corp.* v. *Superior Court* (1983) 33 Cal.3d 664, 668 [190 Cal.Rptr. 175, 660 P.2d 399].) If a nonresident's activities in the forum are extensive or wide-ranging, or substantial, continuous and systematic, there is constitutionally sufficient relationship to warrant jurisdiction for all causes asserted against him. (*Perkins* v. *Benguet Mining Co.* (1952) 342 U.S. 437, 447-448 [96 L.Ed. 485, 493-494, 72 S.Ct. 413]; *Buckeye Boiler Co.* v. *Superior Court* (1969) 71 Cal.2d 893, 898-899 [80 Cal.Rptr. 113, 458 P.2d 57].) However, if the defendant's activities in the forum are not so pervasive as to justify the exercise of general jurisdiction over him, then the jurisdiction depends upon the quality and nature of his activity in the forum relative to the particular cause of action. In such a situation the cause of action must arise out of an act done or transaction consummated in the forum, or the defendant must perform some other act by which he purposefully avails himself of the privilege of conducting activities in the forum, thereby invoking the benefits and protections of its laws. (*Hanson* v. *Denckla* (1958) 357 U.S. 235, 253 [2 L.Ed.2d 1283, 1297, 78 S.Ct. 1228]; *Cornelison* v. *Chaney* (1976) 16 Cal.3d 143, 147-148 [127 Cal.Rptr. 352, 545 P.2d 264].) A defendant obtains the benefits and protections of the forum if as a matter of "commercial actuality," he engages in economic activity within the state. (*McGee* v. *International Life Ins. Co.* (1957) 355 U.S. 220, 222-223 [2 L.Ed.2d 223, 225-226, 78 S.Ct. 199].) The defendant conducts economic activity within the state as a matter of "commercial actuality" whenever the purchase or use of his product within the state generates income for the defendant and it is not so fortuitous or unforeseeable as to negative the existence of intent on his part to bring about this result. (*Buckeye Boiler Co.* v. *Superior Court,*

*supra,* 71 Cal.2d at pp. 901-902; see also *Secrest Machine Corp.* v. *Superior Court, supra,* 33 Cal.3d at p. 669; *Davis* v. *Superior Court* (1976) 62 Cal.App.3d 484, 489-490 [133 Cal.Rptr. 115].)

 Once it is established that the defendant has engaged in activity of the requisite quality and nature in the forum state and the cause of action is sufficiently connected with this activity, the assumption of jurisdiction (i.e., limited jurisdiction) depends upon a balancing of the convenience to the defendant in having to defend himself in the forum as against the interest of the plaintiff in suing locally, and the interest of the state to provide a forum for its residents. (*McGee* v. *International Life Ins. Co., supra,* 355 U.S. at p. 223 [2 L.Ed.2d at p. 226]; *Fisher Governor Co.* v. *Superior Court* (1959) 53 Cal.2d 222, 225-226 [1 Cal.Rptr. 1, 347 P.2d 1].) In other words, once the threshold of sufficient activity of the defendant has been passed, the assumption of jurisdiction depends on the principles of "forum conveniens." (*Buckeye Boiler Co.* v. *Superior Court, supra,* 71 Cal.2d at p. 899; Ehrenzweig, *The Transient Rule of Personal Jurisdiction: The "Power" Myth and Forum Conveniens* (1956) 65 Yale L.J. 289, 312.) (See discussion, *infra.*) When viewed in light of these premises, the undisputed facts reveal (*Circus Circus Hotels, Inc.* v. *Superior Court* (1981) 120 Cal.App.3d 546, 555-556 [174 Cal.Rptr. 885]; *Arnesen* v. *Raymond Lee Organization, Inc.* (1973) 31 Cal.App.3d 991, 995 [107 Cal.Rptr. 744]) that each of the four respondents did have multifold and substantial contacts with the forum and as a consequence they may be subjected to the limited jurisdiction of the California court in full accord with the precepts of due process.

### FORUM-RELATED ACTIVITIES OF BANK RESPONDENTS

Appellant first contends that the forum-related activities of respondents FNB and CBT were so numerous, significant and wide-ranging that at least limited jurisdiction over these respondents was justified (if not compelled) under the legal premises set out, *supra.* FNB and CBT counter this argument by claiming that their contact with the forum amounted only to a somewhat complex lease brokerage arrangement coupled with interstate financial transactions which are insufficient by themselves to subject a nonresident defendant to the jurisdiction of a California court. (E.g., *Circus Circus Hotels, Inc.* v. *Superior Court, supra,* 120 Cal.App.3d 546; *R. E. Sanders & Co.* v. *Lincoln-Richardson Enterprises, Inc.* (1980) 108 Cal.App.3d 71 [166 Cal.Rptr. 269]; *E.I.C., Inc.* v. *Bank of Virginia* (1980) 108 Cal.App.3d 148 [166 Cal.Rptr. 317, 9 A.L.R.4th 654]; *Floyd J. Harkness Co.* v. *Amezcua* (1976) 60 Cal.App.3d 687 [131 Cal.Rptr. 667]; *Belmont Industries, Inc.* v. *Superior Court* (1973) 31 Cal.App.3d 281 [107 Cal.Rptr. 237]; *Interdyne Co.* v. *SYS Computer Corp.* (1973) 31

Cal.App.3d 508 [107 Cal.Rptr. 499]; *Thos. P. Gonzalez Corp.* v. *Consejo Nacional, Etc.* (9th Cir. 1980) 614 F.2d 1247; *Benjamin* v. *Western Boat Building Corporation* (5th Cir. 1973) 472 F.2d 723, etc.) ██ A careful analysis of the quality and nature of these respondents' California or California-related activities persuades us that respondents' contention is unfounded and that the imposition of California jurisdiction against both FNB and CBT was mandated.

FNB's forum-related activities may be set out in details as follows:

(1) *FNB's contacts with the forum*: FNB moved to quash the service of summons and dismiss the action against it for lack of personal jurisdiction and lack of proper venue. (12 U.S.C. § 94). The trial court granted the motion on both grounds. Appellant argues that the ruling of the trial court was erroneous on both counts. We agree.

(a) FNB, together with CBT and the two California banks (Security Pacific and Crocker) entered into a so-called owner participation agreement whereby they agreed to invest approximately $20 million in owning and leasing the "Valerie F." Of this amount, FNB put up 56.41 percent of the vessel equity and became the equitable owner of the tugboat which engaged in rice trade with California. ██ While the existence of jurisdiction does not depend on a single contact, it is established that the ownership of a chattel in the forum figures as an important factor in resolving the issue. (*Gill* v. *Surgitool Inc.* (1967) 256 Cal.App.2d 583, 586-587 [64 Cal.Rptr. 207], overruled on other grounds in *Buckeye Boiler Co.* v. *Superior Court, supra,* 71 Cal.2d at p. 903.)

██ (b) In addition, and even more significantly, FNB and the two California banks entered into an owner trust agreement with CBT. Under this agreement CBT consented to be the legal owner and charterer (lessor) of the vessel and proceeding on behalf of FNB and the two California banks; it assumed multiple duties concerning the financing, construction and lease of the tugboat which, in turn, comprised heavy California involvement and contacts with California entities. (See detailed discussion, *infra.*) Since pursuant to the above agreement CBT, in effect, became an agent of the owner participants, including FNB, its forum-related activities are clearly imputable to FNB and should be counted as FNB contacts for jurisdictional purposes. (*Wells Fargo & Co.* v. *Wells Fargo Exp. Co.* (9th Cir. 1977) 556 F.2d 406, 419; see also *Great American Ins. Co.* v. *Katani Shipping Co.* (9th Cir. 1970) 429 F.2d 612, 614; *Delray Beach Aviation Corp.* v. *Mooney Aircraft, Inc.* (5th Cir. 1964) 332 F.2d 135, 138-141.)

(c) FNB, as one of the owner participants, authorized chartering the vessel to IBC which, in turn, was to hire it out to RGA. RGA was requested

by the owner participants to guarantee the payment of the charter and also to compensate FNB and the other owner participants for the potential tax benefits lost to them. Under the agreement FNB, through CBT, was to receive about a $1.4 million quarterly charter fee from RGA for the use of the vessel. Moreover, FNB was to borrow a portion of the construction loan from Security Pacific, a California corporation, and was to repay the loan here. ■ It is, of course, elementary that when, as in the instant case, a nonresident defendant engages in purposeful activities in the forum through which it gains multiple economic benefits, it is both reasonable and justified to make it amenable to the jurisdiction of the forum state. (See *McGee* v. *International Life Ins. Co.*, *supra*, 355 U.S. at pp. 222-223 [2 L.Ed.2d at pp. 225-226]; *Secrest Machine Corp.* v. *Superior Court*, *supra*, 33 Cal.3d at p. 669; *Buckeye Boiler Co.* v. *Superior Court*, *supra*, 71 Cal.2d at p. 902.)

■ (d) The additional substantial contacts with the forum may be described as follows: FNB had a wholly owned subsidiary (Matrix Leasing International) in San Francisco, California. FNB's senior vice president, Dwight W. Anderson, repeatedly traveled to California in order to negotiate the credit terms of the construction loan for the boat with Security Pacific. Lastly, it was agreed by FNB that in four of the underlying contracts (Loan Agreement; Agreement to Construct and Let; Supervisory Agreement; and RGA Guarantee Agreement), the California law would govern. Needless to emphasize that the ownership of a subsidiary in the forum (*Iowa Elec. Light & Power Co.* v. *Atlas Corp.* (8th Cir. 1979) 603 F.2d 1301), credit negotiations in the state of jurisdiction (*Floyd J. Harkness Co.* v. *Habermann* (1976) 60 Cal.App.3d 696 [131 Cal.Rptr. 672]) and the choice of the law of the forum (*Marathon, etc.* v. *Mountain Empire Const. Co.* (5th Cir. 1981) 653 F.2d 921) all constitute additional substantial contacts making it reasonable for the forum state to invoke in personam jurisdiction over a nonresident defendant. (*Data Disc, Inc.* v. *Systems Tech. Assoc., Inc.* (9th Cir. 1977) 557 F.2d 1280, 1287.)

Appellant's second contention that the order quashing the service of summons was not warranted under the venue provisions of the federal law either, is also well taken.

■ While at the time of institution of the present lawsuit 12 United States Code section 94 required that actions against a national banking institution be brought only in the county in which the banking association is located and FNB, a national bank, was neither established nor located in San Francisco at that time, the dismissal of the party for improper venue nonetheless must be held erroneous for two reasons. One, the California law is well settled that where the forum activities of the bank are as wide-ranging and

substantial as in the case at bench (see discussion, *supra*), the venue provisions of the federal law are deemed to be waived. (*Michigan Nat. Bank v. Superior Court* (1972) 23 Cal.App.3d 1, 13 [99 Cal.Rptr. 823]; *Levine v. Second Nat. Bk. of Danville* (1976) 63 Cal.App.3d 258, 260-261 [133 Cal.Rptr. 697]). Two, as amended in 1982 section 94 limits venue only in cases where the bank is in receivership with the Federal Deposit Insurance Corporation.[5] Since there is no indication in the record that FNB was (or is) in receivership, section 94 no longer presents a barrier to venue. (*Hill v. Equitable Trust Co.* (D.Del. 1983) 562 F.Supp. 1324, 1332.)

■■■ (2) *CBT's contacts with the forum*: CBT entered into a trust agreement with the owner participants which included not only FNB, but also two California-based banks: Security Pacific and Crocker. Under this agreement CBT became the trustee and legal owner of the vessel, and proceeding on behalf of the owner participants CBT (1) made a construction contract for the building of the "Valerie F" by assuming the previous contracts between BFC (IBC) and the shipbuilders (one of the builders was DeLaval, an Oakland-based manufacturer); (2) made a construction loan with Security Pacific, a California entity, to finance the building of the ship which included the manufacture of the engines in Oakland; (3) solicited government bonds for the financing of the vessel (a part of the solicitation took part in California); (4) assumed the supervision of the construction of the ship through its agent, BFC (IBC), a California ship operator (a part of the supervision was to take place in Oakland); (5) took delivery of the vessel and chartered it to IBC for the purpose of carrying rice from Sacramento, California, to Puerto Rico; and (6) collected the charter fee of approximately $1.4 million a quarter from RGA, and remitted it to FNB and other owner participants. In addition, several of the agreements to which CBT was a party (i.e., Loan Agreement; Construction Agreement; Supervisory Agreement; Guarantee Agreement) provided that their provisions would be governed by the California law.

In sum, CBT (akin to FNB) purposefully injected itself into transactions having substantial California contacts and by doing so it invoked the protection and benefits of the California law. The conclusion is thus inescapable that California had an unquestionable right to assert its jurisdiction over CBT, a nonresident defendant, under both the federal and California law.

---

[5]Section 94, as amended October 15, 1982, reads as follows: "Any action or proceeding against a national bank association for which the Federal Deposit Insurance Corporation has been appointed receiver, or against the Federal Deposit Insurance Corporation as receiver of such association, shall be brought in the district or territorial court of the United States held within the district in which that association's principal place of business is located, or in the event any state, county or municipal court has jurisdiction over such an action or proceeding, in such court in the county or city in which that association's principal place of business is located." (Pub.L. No. 97-320, § 406, 96 Stat. 1512.)

(*Hanson* v. *Denckla, supra,* 357 U.S. 235, 253 [2 L.Ed.2d 1283, 1297]; *Cornelison* v. *Chaney, supra,* 16 Cal.3d 143, 147-148; *Secrest Machine Corp.* v. *Superior Court, supra,* 33 Cal.3d 664, 669.)

The mutual contention of respondents FNB and CBT that they were not subject to California jurisdiction because they were engaged only in interstate business with California entities and did not have office, mailing address, telephone number, agent and the like, nor did they solicit involvement in the transactions at issue in this state, must be rejected for at least five distinct reasons.

One, in an analogous factual situation the California court held that the financing and purchase of a chattel within the state is an activity which may subject the nonresident financing institution to the jurisdiction of the courts of this state with respect to disputes connected with such transaction. ■ This is so because jurisdiction may attend even an isolated transaction if the latter qualifies as a substantial contact. (*Michigan Nat. Bank* v. *Superior Court, supra,* 23 Cal.App.3d 1, 6; see also *McGee* v. *International Life Ins. Co., supra,* 355 U.S. 220, 222 [2 L.Ed.2d 223, 225].) The purchase of the "Valerie F" and its chartering to a California plaintiff for almost $1.5 million a quarter most assuredly qualifies as a substantial contact with California.

Two, contrary to respondents' argument, IBC, a California-based ship operator, served as an agent for CBT and as a subagent for FNB and hence, its activities were imputable to the principals. ■ Therefore, under well-recognized law a principal may be served for the in-state actions of its agent consistently with the long-arm statutes and due process. (*Wells Fargo & Co.* v. *Wells Fargo Exp. Co., supra,* 556 F.2d 406, 419.)

Three, as has been emphasized earlier, it is not the quantity, but rather the nature and quality of the defendant's activities which determine the jurisdiction of the forum state in an individual case. (*Hanson* v. *Denckla, supra,* 357 U.S. at p. 253 [2 L.Ed.2d at p. 1297].) As the Supreme Court stated in *Internat. Shoe Co.* v. *Washington, supra,* 326 U.S. at p. 319 [90 L.Ed. at pp. 103-104]: "It is evident that the criteria by which we mark the boundary line between those activities which justify the subjection of a corporation to suit, and those which do not, cannot be simply mechanical or quantitative. The test is not merely, as has sometimes been suggested, whether the activity, which the corporation has seen fit to procure through its agents in another state, is a little more or a little less. [Citations.] Whether due process is satisfied must depend rather upon the quality and nature of the activity . . . ." ■ Consistent therewith, it has been repeatedly held that where, as here, the nonresident defendant consummates a trans-

action with the forum or performs some act by which it purposefully avails itself of the privilege of conducting business in the forum and derives substantial economic benefit from that transaction or other act, the minimum contacts requirement has been met and the nonresident defendant may be properly subjected to the jurisdiction of the forum. (*Data Disc, Inc.* v. *Systems Tech. Assoc., Inc., supra,* 557 F.2d at p. 1287; *Buckeye Boiler Co.* v. *Superior Court, supra,* 71 Cal.2d at p. 904; *American Continental Import Agency* v. *Superior Court* (1963) 216 Cal.App.2d 317 [30 Cal.Rptr. 654].)

Four, respondents, in effect, attempt to isolate their forum-related activities and to point out that these activities, each taken alone, are insufficient to sustain the jurisdiction of the forum.[6] This approach, however, is clearly unavailing because under well-settled law we must take into account not any single act but the totality of the defendant's activities in order to determine the propriety of personal jurisdiction. (*Kulko* v. *California Superior Court* (1978) 436 U.S. 84, 92 [56 L.Ed.2d 132, 141, 98 S.Ct. 1690].) ▓▓ When respondents' forum-related activities are considered in toto rather than in isolation or in parte, the jurisdiction of the California court is deemed established as a matter of law.

Lastly, we observe that the cases relied upon by respondents FNB and CBT are clearly distinguishable and do not negate the assumption of jurisdiction in the present case. For example, in *Floyd J. Harkness Co.* v. *Amezcua, supra,* 60 Cal.App.3d 687, a California resident sought to base jurisdiction on certain acts of the plaintiffs rather than the nonresident defendant. Moreover, the subject matter of the litigation, the product of the defendant, did not enter the state. By contrast, in the case at bench the California jurisdiction is premised on multifold forum activities of respondents and its local agents. In addition, the "Valerie F," the center of this dispute, was

---

[6]For example, respondents FNB and CBT argue that they were engaged merely in interstate business with California entities which falls short of sustaining jurisdiction (*R. E. Sanders & Co.* v. *Lincoln-Richardson Enterprises, Inc., supra,* 108 Cal.App.3d 71; *Thos. P. Gonzalez Corp.* v. *Consejo Nacional, Etc., supra,* 614 F.2d 1247); that the foreseeability of the use of the chattel in the forum alone does not justify jurisdiction (*World-Wide Volkswagen Corp.* v. *Woodson* (1980) 444 U.S. 286 [62 L.Ed.2d 490, 100 S.Ct. 559]; *Ins. Co. of North America* v. *Marina Salina Cruz* (9th Cir. 1981) 649 F.2d 1266); that unilateral actions of third parties over which a nonresident has no control are not relevant to establish jurisdiction (*Hanson* v. *Denckla, supra,* 357 U.S. 235 [2 L.Ed.2d 1283]; *Cornell University Medical College* v. *Superior Court* (1974) 38 Cal.App.3d 311 [113 Cal.Rptr. 291]); that the single action to discuss credit terms in the forum is insufficient to subject the nonresident defendant to personal jurisdiction (*Floyd J. Harkness Co.* v. *Habermann, supra,* 60 Cal.App.3d 696); that lack of solicitation in the forum militates against assumption of jurisdiction (*Thos. P. Gonzalez Corp.* v. *Consejo Nacional, Etc., supra*); that the relationship of guaranteeship by itself is insufficient to establish jurisdiction (*Sibley* v. *Superior Court, supra,* 16 Cal.3d 442); that merely causing effect in the forum state is not sufficient to justify personal jurisdiction (*Szabo* v. *Medical Information Bureau* (1981) 127 Cal.App.3d 51 [179 Cal.Rptr. 368]), etc.

designed to, and was in fact used in California to carry rice on a regular basis in both domestic and foreign trade. In *Belmont Industries, Inc.* v. *Superior Court, supra,* 31 Cal.App.3d 281 and *Interdyne Co.* v. *SYS Computer Corp., supra,* 31 Cal.App.3d 508, the defendants' only contact with the forum was the negotiation of the contract through interstate communication but, unlike the case at bench, the out-of-state defendants had no agent in the forum, nor did they own, use or possess property therein. *Benjamin* v. *Western Boat Building Corporation, supra,* 472 F.2d 723, is also distinguishable from the present situation. In *Benjamin* the defendant was only a shipbuilder. In contradistinction thereto, respondents FNB and CBT herein were the owners of the ship which was leased through their local agent, a California corporation, to a California resident knowing that it would be used to carry merchandise from California to Puerto Rico.

## FORUM-RELATED ACTIVITIES OF SOUTHERN—THE SHIPBUILDER

Appellant's second jurisdictional challenge is directed against Southern, the builder of the tug portion of the vessel. Appellant contends that due to the numerous contacts with the forum, the huge income derived from the construction of the ship and the knowledge that the vessel would be used in California, Southern was subject to California jurisdiction and that as a consequence the ruling of the trial court was prejudicially erroneous. We agree.

Contrary to Southern's contention that it was only an out-of-state shipbuilder and thus immune from local jurisdiction under due process, the record reveals that Southern's forum-related activities were both manifold and substantial and therefore supports personal jurisdiction under *Internat. Shoe* and its progeny. (See, *ante.*) Thus, the evidence reveals that Southern solicited business in California from the San Francisco-based firm BFC (IBC), by sending a price quotation for the building of the tugboat part of the "Valerie F" to BFC's agents in New Orleans, Louisiana, and then sending the proposed contract to BFC's headquarters in San Francisco. After additional negotiations, the construction contract between BFC (IBC) and Southern was executed in San Francisco on August 24, 1973. On this occasion Alain R. Seligman, Southern's president, flew to San Francisco in order to sign the contract. Seligman was fully aware that the construction of the vessel was a complex integrated transaction which involved a number of other entities as well, including CBT, the owner trustee to whom the completed vessel was to be delivered, DeLaval, the Oakland manufacturer of the engines, and Breit, the designer of the plan and specifications of the ship. Seligman visited California on other occasions as well. Thus, he attended a ceremony on September 6, 1973, when BFC (IBC) executed another part of the integrated contract with Maryland Shipbuilding and De-

Laval. On January 26 and January 30, 1976, Seligman came to California again and participated in meetings where technical problems concerning the ship engines were discussed with DeLaval in Oakland. At least at one of those meetings Al Singer, an electrical engineer of Southern, was also present. Between January 26 and December 30, 1976, when the vessel was ultimately delivered, there had been numerous letters and telephone communications between BFC (IBC) and Southern which all dealt with technical and other problems concerning the construction of the vessel.

The evidence further reveals that Southern derived a huge amount of income from the building of the tugboat. The contract price stated in the agreement was $4,565,000 which was later substantially increased to the sum of almost $10 million. These funds were remitted by IBC in California to respondent's headquarters in Louisiana.

Also, there is substantial evidence that Southern knew at all relevant times that the tugboat would be utilized by RGA, a California corporation, for the carriage of rice and other commodities from California to Puerto Rico and other Gulf Coast ports.

Lastly, and equally to the point, Southern's liability for the ship did not end with its delivery to CBT's agent outside of California. Quite the contrary—the construction agreement explicitly provided that "The Builder [Southern] will replace or make repairs to all parts of the hull, outfit, machinery, etc. which fails as a result of defective material, workmanship, or design which may occur within one (1) year from the date of delivery to Owner." The significance of the quoted provisions of the construction contract is obvious: since Southern knew that the "Valerie F" would be operated in or to and from California, the performance of guarantee on workmanship and materials as a matter of necessity was contemplated to be in California.

The jurisdictional import of the above facts is all but self-evident. By becoming a party to an integrated transaction in which several California entities directly or indirectly participated, Southern conducted economic activity in the state whereby it invoked the protection and benefits of the forum within the meaning of the law. (*Hanson* v. *Denckla, supra,* 357 U.S. 235, 251, 253 [2 L.Ed.2d 1283, 1296, 1297]; *Secrest Machine Corp.* v. *Superior Court, supra,* 33 Cal.3d 664, 669.) Also, Southern derived substantial gross income from its forum-related activity which under well-settled law by itself is sufficient to render it answerable in the court of the forum. (*Buckeye Boiler Co.* v. *Superior Court, supra,* 71 Cal.2d at p. 904; *American Continental Import Agency* v. *Superior Court, supra,* 216 Cal.App.2d 317.) Moreover, by the alleged wrong said to have occurred in the construction

of the ship in Louisiana, Southern caused a detrimental effect in the forum state. As emphasized in *Secrest Machine Corp.* v. *Superior Court, supra,* 33 Cal.3d 664, 669: "California has recognized that a state may exercise jurisdiction over one who causes effects in the state by an act or omission done elsewhere with respect to causes of action arising from the effects." (See also *Sibley* v. *Superior Court, supra,* 16 Cal.3d 442, 445-446; *Thomas J. Palmer, Inc.* v. *Turkiye Is Bankasi A.S.* (1980) 105 Cal.App.3d 135, 152 [164 Cal.Rptr. 181]; *Quattrone* v. *Superior Court* (1975) 44 Cal.App.3d 296, 306 [118 Cal.Rptr. 548]; *Floyd J. Harkness Co.* v. *Amezcua, supra,* 60 Cal.App.3d 687; Judicial Council com. to Code Civ. Proc., § 410.10, 14 West's Ann. Code Civ. Proc. (1973 ed.) pp. 459-484, Deerings Ann. Code Civ. Proc. (1972) p. 667.) Finally, due to the integrated nature of the transaction involving numerous other defendants as well, who are all subject to the authority of the California court, the exercise of jurisdiction over Southern in this state is both reasonable and desirable under the principles of forum conveniens. (*Cornelison* v. *Chaney, supra,* 16 Cal.3d at pp. 150-151; *Secrest Machine Corp.* v. *Superior Court, supra,* at pp. 672-673; *Buckeye Boiler Co.* v. *Superior Court, supra,* at p. 906; *Henry R. Jahn & Son* v. *Superior Court* (1958) 49 Cal.2d 855, 860-862 [323 P.2d 437].) (See discussion, *infra.*)

In an attempt to minimize its forum-related activities Southern resorts to the same tactic as respondents FNB and CBT did, i.e., purporting to isolate its activities and proving that none of these acts taken alone support the jurisdiction of the forum. Thus, Southern contends that mere execution of the construction contract in San Francisco (*Davis* v. *P. M. Video, Inc.* (D.Mass. 1982) 532 F.Supp. 1012, 1013; *National Spinning Co.* v. *Talent Network, Inc.* (S.D.N.Y. 1979) 481 F.Supp. 1243), attendance of Southern's president of a meeting in the forum (*Erlanger Mills* v. *Cohoes Fibre Mills* (4th Cir. 1956) 239 F.2d 502, 508-509), and receipt of payment from California (*Circus Circus Hotels, Inc.* v. *Superior Court, supra,* 120 Cal.App.3d 546), etc., are insufficient contacts to establish jurisdiction. Our summary answer to this contention is twofold. First, as set out above, Southern's forum-related contacts constituted substantial economic activity and were tantamount to an invocation of the benefits and protection of California giving rise to personal jurisdiction as a matter of law. Second, Southern's activities in the state must be considered together rather than in isolation because the issue whether the requirements of due process have been met, must be adjudged based upon the totality of the circumstances. (*Kulko* v. *California Superior Court, supra,* 436 U.S. 84, 92 [56 L.Ed.2d 132, 141].) (See discussion, *supra.*) By using the latter method, we find no difficulty in properly measuring the true extent of Southern's involvement in the forum and conclude that the assumption of jurisdiction was not only warranted, but also mandated in this case.

Southern's further claim that the foreseeability of the use of the vessel in the forum is jurisdictionally negligible (*World-Wide Volkswagen Corp.* v. *Woodson, supra,* 444 U.S. 286 [62 L.Ed.2d 490]) and that at any rate the causes of action here alleged did not grow out of Southern's forum-related activities (*Circus Circus Hotels, Inc.* v. *Superior Court, supra,* 120 Cal.App.3d at p. 562; *Floyd J. Harkness Co.* v. *Amezcua, supra,* 60 Cal.App.3d at p. 691; *Cornell University Medical College* v. *Superior Court, supra,* 38 Cal.App.3d at p. 316), can also be answered in relatively brief fashion. In *World-Wide Volkswagen,* defendants' only connection with Oklahoma was the fact that the automobile sold in New York to New York residents became involved in an accident in Oklahoma. The jurisdiction against the nonresident defendants was denied for the reason that there was no foreseeability at the time the vehicle was sold that it would be ever taken to Oklahoma. No party to the sales contract was a forum resident and it was no more foreseeable that the vehicle would eventually be in Oklahoma than in other states. By contrast, Southern purposefully sought to do business with a California entity, executed its contract there and knew that other California companies, including RGA, were involved in the transaction and also that the vessel would be used regularly to transport products from and to California. In short, the operation of the vessel in California was not fortuitous but anticipated and planned. Thus, the case at bench falls within the language set out in *World-Wide Volkswagen:* "The forum State does not exceed its powers under the Due Process Clause if it asserts personal jurisdiction over a corporation that delivers its products into the stream of commerce with the expectation that they will be purchased by consumers in the forum State." (*World-Wide Volkswagen Corp.* v. *Woodson, supra,* at pp. 297-298 [62 L.Ed.2d at 502].) The second half of Southern's argument, in turn, must be rejected for the plain reason that the causes of action alleged in RGA's complaint (breach of contract, breach of warranty, negligent construction, etc.) stemmed at least in part, from Southern's activities in the forum. Just to mention a few—the construction contract giving rise to the lawsuit was signed by Southern's president in San Francisco; the representatives of Southern took an active part in discussing the technical problems of the engines at DeLaval's plant in Oakland and also conducted extensive mail and telephone communications with DeLaval pertaining to the same matter. And the causes of action to a substantial degree grew out of the allegedly defective engines.

We lastly note that the additional cases cited by Southern are either irrelevant or distinguishable from the case at bench. For example, *Thomas J. Palmer, Inc.* v. *Turkiye Is Bankasi A.S., supra,* 105 Cal.App.3d 135 is inapplicable because it involved international banking transactions where no evidence was presented that the alleged wrongs by the bank were committed in California. The factual situation here present is markedly different in both

respects. In *DeJames* v. *Magnificence Carriers, Inc.* (3d Cir. 1981) 654 F.2d 280, Hitachi, a Japanese firm's only contact with the forum was that the ship on which the plaintiff was injured had been repaired in Japan. In declining jurisdiction over the nonresident defendant the court emphasized: "The fortuitous circumstance that the owners chose to dock [the vessel] in New Jersey is insufficient to support the assertion of jurisdiction over Hitachi under the New Jersey long-arm rule." (At p. 286.) Lastly, in both *Ins. Co. of North America* v. *Marina Salina Cruz, supra,* 649 F.2d 1266 and *Floyd J. Harkness Co.* v. *Amezcua, supra,* 60 Cal.App.3d 687, the defendants were foreign countries where higher level of contacts are required to make the assumption of jurisdiction reasonable than in cases involving sister states. Moreover, in *Amezcua* "the defendant sent no representatives to, nor was he personally present in California in connection with the contracts or promissory notes giving rise to the . . . litigation." (At p. 693.)

### Forum-related Activities of Breit—The Ship Designer

▆▆▆▆ Appellant's third major argument is that respondent Breit, the designer of the vessel, was also subject to the personal jurisdiction of the California court because (1) its activities with the forum were sufficient to satisfy the minimum contacts requirements of due process; and (2) the well settled precepts of forum conveniens also dictate the assumption of jurisdiction in this case. Appellant's point is well taken.

Breit's contacts with the forum may be summarized as follows: Breit entered into contract with BFC, a San Francisco-based firm to design the "Valerie F." Negotiations over the final form of the contract took place between California and Louisiana, where Breit had its headquarters. In addition to BFC (IBC), Breit was connected with three other California individuals or entities: Miklos M. Kossa, a Berkeley naval architect; David J. Seymour, a San Francisco naval architect; and DeLaval, the Oakland supplier of the engines of the vessel. The record demonstrates that Breit, the designer of the vessel, had to be and, in fact, was aware of the purpose for which the "Valerie F" was intended and also that the vessel would be used to carry rice from California to Puerto Rico.[7] Breit received a substantial

---

[7]The illustrative parts of the deposition of Emilio Garcia, the president of Breit, read as follows:

"Q. Did Mr. Ferrari [president of BFC] tell you that the shipment of rice would be originating from California?

"A. Yes, he said it would originate in California.

"Q. You knew before you entered into your contract that the shipment of rice would be originating—

"A. He said one of the services was to carry rice from California to Puerto Rico because it was a special variety of grain that was short.

sum of $150,000 from BFC (IBC) for the design, plans and specifications prepared pursuant to the contract and also expected future economic benefits from the deal. In addition, there were both personal visits and written communications between BFC (IBC) and Breit. In late January 1976 Lloyd Cotton, an engineer of Breit, attended a meeting at the Oakland plant of De-Laval where the technical problems of the engines of the tugboat were discussed. T. A. Williams, another technical expert of Breit, was also present at that meeting and participated in the discussions. Later, another Breit engineer was sent to California to perform experiments on the tugboat portion of the vessel, but the vessel was not in California at that time. Mr. Garcia, Breit's president, made several stopovers in California in returning from the orient, which visits also included business discussions with San Francisco shipping firms.

Lastly, there was extensive correspondence between Breit engineers and DeLaval in which specifications for the ship engines were analyzed and discussed. We entertain no doubt that the above activities singly and in combination constituted substantial contacts with the forum whereby Breit, an out-of-state defendant, invoked the benefits and protection of the California law rendering it amenable to personal jurisdiction in the California court. (*Hanson* v. *Denckla, supra,* 357 U.S. 235, 251-253 [2 L.Ed.2d 1283, 1296-1297]; *Secrest Machine Corp.* v. *Superior Court, supra,* 33 Cal.3d 664, 669; *Buckeye Boiler Co.* v. *Superior Court, supra,* 71 Cal.2d 893, 904.) (See detailed discussions, *supra.*)

In addition to the above stated reasons, the assertion of California jurisdiction against all respondents is justified by the precepts of forum conveniens as well. ▪ The considerations pertaining to the convenient forum include, inter alia, the interest of the state in providing a forum to its residents; the choice of law; the relative availability of evidence; the ease of access to an alternative forum; the avoidance of the multiplicity of suits and conflicting adjudications; and inconvenience to the defendant to defend himself in the local forum. (*Cornelison* v. *Chaney, supra,* 16 Cal.3d 143, 151; *Henry R. Jahn & Son* v. *Superior Court, supra,* 49 Cal.2d 855, 860-862.)

In applying these criteria to the case at bench, we first observe that RGA is a California corporation comprising circa 2,000 rice growers throughout

" . . . . . . . . . . . . . . . . . .
"Q. You stated that it was important that you know the needs and requirements of TBSI?
"A. Yes, definitely.
"Q. Before you could discharge your duties, before you could perform your duties?
"A. Correct. Because the drawing was given to us after what was intended, but we had to verify that it was suitable for the purpose intended.
"Q. It was likely then that at that time you knew the rice was going to be shipped ·from California to Puerto Rico?
"A. Yes. . . ."

the State of California. As has been repeatedly emphasized, California has a substantial interest in providing a forum for its local residents who seek redress for wrongs committed against them by out-of-state defendants. (*Buckeye Boiler Co.* v. *Superior Court, supra,* 71 Cal.2d at p. 906.) Choice of law principles also militate for the maintenance of the local jurisdiction, inasmuch as at least four of the underlying agreements between and among the parties are governed by the California law. Since the "Valerie F," the vessel in dispute, is operated and maintained primarily in California, the availability of evidence factor also calls for a local trial. The ease of access to an alternative forum and the multiplicity of suits with the resultant conflicting adjudications further underline the necessity of the California jurisdiction. As pointed out earlier, the construction of the vessel entailed an extremely complex integrated operation by several California and numerous out-of-state defendants with headquarters in Minnesota, Connecticut, Louisiana and Maryland, whose liability for the alleged defects of the vessel is (or may be) both overlapping and interdependent. Under these circumstances it would be burdensome, unreasonable and impractical to force the California plaintiff to sue in four or five different states and would be almost impossible to determine the relative liability of the several defendants in isolated and separated lawsuits. The last mentioned factor, the inconvenience to defendants having to stand the legal challenge in a California court, does not change the balance either. As aptly noted in *Hanson* v. *Denckla, supra,* 357 U.S. at pp. 250-251 [2 L.Ed.2d at pp. 1295-1296], the same technological progress in communication and transportation that has increased the flow of commerce between the states and the need for jurisdiction over nonresidents, has simultaneously decreased the burdens inherent in defending a lawsuit in a foreign tribunal. (Accord *Secrest Machine Corp.* v. *Superior Court, supra,* 33 Cal.3d 664, 673.)

 Breit's additional claim that it was not subject to local jurisdiction because it had no office, place of business, bank account, telephone listing in California, nor did it solicit business in this state, etc., may be disposed of in brief fashion. First, Breit's contention is virtually identical to the arguments raised by other respondents and therefore must be rejected for the same reasons that the assertions of the other respondents are rejected. Secondly, the case in point is *Jones Enterprises, Inc.* v. *Atlas Service Corporation* (9th Cir. 1971) 442 F.2d 1136, where in an almost identical situation the court held that a designer is subject to the jurisdiction of a forum state for the injury or other harm caused by the faulty design in the forum even if the design was made or drawn elsewhere. In its reasoning the court underlined that while the existence of an effect in the forum state cannot, without more, subject its cause to in personam jurisdiction in that state, very little more is required to satisfy due process. Moreover, the court reiterated the long held principle that "when the activities complained

of create a substantial risk of injury [or other harm] in the forum state, direct contact with that state is not essential. It is sufficient that, as here, the defendant purposefully sets his product or his designs into the stream of commerce, knowing or having reason to know that they will reach the forum state and that they create a potential risk of injury." (At p. 1140; see also *Eyerly Aircraft Co.* v. *Killian* (5th Cir. 1969) 414 F.2d 591; *Duple Motor Bodies, Ltd.* v. *Hollingsworth* (9th Cir. 1969) 417 F.2d 231.)

The order as to each respondent is reversed with directions to enter order denying motion to quash.

Scott, Acting P. J., and Barry-Deal, J., concurred.