GANIS CORPORATION OF
CALIFORNIA, a California
Corporation, Plaintiff,

v.

Neil D. JACKSON, an individual, and
Ann E. Jackson, an individual,
Defendants.

Civ. A. No. MBD 85–819–C.

United States District Court,
D. Massachusetts.

May 19, 1986.

G. Richard Shell, Hill & Barlow, Boston, Mass., for plaintiff.

Stephen A. Hopkins, Paul Killeen, Sherburne, Powers & Needham, Boston, Mass., for defendants.

## MEMORANDUM

CAFFREY, Chief Judge.

This is a civil action to recover full payment on an installment loan which is before this Court on the defendants' motion for relief from judgment, filed pursuant to Fed.R.Civ.P. 60(b)(4). On March 8, 1985, the plaintiff, Ganis Corporation ("Ganis") commenced this action against the defendants, Ann E. and Neil D. Jackson ("the Jacksons"), in the United States District Court for the Central District of California. The Jacksons received actual notice of the suit but did not enter an appearance in the action. On July 23, 1985, the California federal court entered a default judgment against the defendants. Pursuant to 28 U.S.C. § 1963, Ganis registered that judgment in the United States District Court for the District of Massachusetts and an execution issued. The defendants now seek to vacate the judgment entered in the California court, claiming that the judgment is void because it was entered by default in a court which had no personal jurisdiction over them.

Ganis is a California corporation with its principal place of business in Newport Beach, California. Ganis is in the business of procuring retail loans for banks and for savings and loans institutions, and also occasionally lends money to borrowers itself. The Jacksons are residents of Massachusetts. Neil D. Jackson is a physician employed by Massachusetts General Hospital; his wife, Ann E. Jackson, works as his secretary. Neither of the defendants own any real or personal property located in California, nor have they ever lived in that state.

In December of 1984, Paul Garfinkel, a Florida resident, telephoned Dr. Jackson in

Massachusetts to discuss the possibility of the Jacksons purchasing a fishing vessel. Jackson had known Garfinkel for some years as a tax attorney engaged in the business of arranging tax sheltered investments and had done business with him in the past. Prior to this phone call, in the spring of 1984, the Jacksons had furnished their tax returns to Garfinkel, presumably because they wanted to participate in one of the tax shelter investments in pleasure and fishing boats that the Jacksons knew Garfinkel was involved in setting up and operating.

Following the telephone conversation between Garfinkel and Dr. Jackson, Garfinkel sent various documents to the Jacksons at their home in Massachusetts pertaining to the tax shelter investment they had discussed. The deal provided that the Jacksons would purchase a fishing boat which would be leased to Garfinkel's firm, Inter Island Charters, Inc., and that charter fees would service the loan necessary to purchase the boat. Garfinkel agreed to obtain the necessary financing for the Jacksons.

Among the financing documents that Garfinkel sent the Jacksons were the "Installment Loan Note" ("Note") and the "Security Agreement" which are central to this case. The Note, in which the Jacksons promised to pay Ganis $405,600, is on a preprinted form with "Ganis Corporation" and its logo printed at the top. It is dated December 15, 1984 and designates Newport Beach under the caption "City in California" as its place of origin. The Note provides, *inter alia*, that payment on the note will be made to Ganis at its main office in Newport Beach, California. Installment payments were due monthly for a period of five years, at the end of which the remaining balance was due in a final balloon payment. The Security Agreement, also on a Ganis form, granted to "Ganis Corporation, 620 Newport Center Drive, Newport Beach, CA 92660" a security interest in a 1984 Trans/Carib Yacht, model and serial

number listed, moored in Boston, Massachusetts. The Security Agreement provides, in relevant part, that Ganis has "the rights and remedies of a secured party under the California Commerical Code" and that the agreement was "signed in, and shall be governed by the laws of, the State of California." Other documents sent by Garfinkel to the Jacksons included a "Truth in Lending Disclosure Statement" and a "Truth in Lending Disclosure Statement Itemization of Amount Financed;" both of these documents had Ganis' name and address at the top, and the latter authorized Ganis to pay the loan proceeds to Trans-Carib Yachts, Inc. The documents were either signed or initialed by both of the Jacksons. The executed documents were sent to Garfinkel in Florida and thereafter transmitted to Ganis in California.[1]

Ganis first became involved in this transaction in November of 1984, when it received a request from a company known as Seagate, Inc. of League City, Texas ("Seagate") to provide financing before the end of the 1984 tax year for the Jacksons' purchase of a new boat. Seagate forwarded to Ganis financial information about the Jacksons, including a loan application form, and the Jacksons' 1981, 1982, and 1983 tax returns. Ganis then proceeded to verify this financial information. On November 29, 1984, Ganis mailed financial documents relating to the Jacksons' boat loan to a Mr. John LeBeau, a Massachusetts bank officer, who, Ganis believed, was representing the Jacksons in the matter. Finding the documents incomplete, LeBeau returned them to Ganis. Early in December 1984, Ganis forwarded another set of documents concerning the Jackson loan to Seagate for final completion and transmittal to the Jacksons. These documents were executed by the Jacksons.

Upon receipt of the documents signed by the Jacksons, Ganis sent a $390,000 check on December 21, 1984 to Trans-Carib Yachts, Inc. in Florida, as the Jacksons had

---

1. Ganis also received the following documents executed by the Jacksons: "Notice of Buyer Acceptance of Marine Vessel," "Notice of Borrowers," and "UCC Financing Statement." Each of these documents had reference to Ganis and its California address.

directed it to do in the Truth in Lending Disclosure Statement Itemization of Amount Financed. On December 27, 1984, Peter Ceglio, a Ganis employee, telephoned Dr. Jackson at his home in Massachusetts to discuss the loan. During that conversation, Dr. Jackson told Ceglio to contact Garfinkel and Andrew Garcia, the persons in charge of the deal, in Florida with regard to matters concerning the boat.

On January 9, 1985, Ganis sent the Jacksons their first monthly statement, requesting the first payment on the loan by January 15, 1985. When it did not receive the payment, Ganis telephoned Jackson, who stated that Garfinkel's company, Inter Island Charters, Inc., was to make the installment payments and that he, Dr. Jackson, would find out why the first payment was late. According to Ganis, Jackson also stated that Garcia and Garfinkel were his financial advisors.[2] This was the first Ganis had heard of Garfinkel. After Jackson called Garfinkel, Ganis received a check to cover the payment, made on Inter Island Charter's account, signed by Garcia.

Late in January, 1985, Ganis learned from Seagate that the boat securing the Jackson loan possibly did not exist. Ganis therefore made a written demand on the Jacksons to produce the boat for inspection. A series of telephone calls ensued between Ganis and the Jacksons. Finally, on February 25, 1985, Ganis formally demanded full payment of the loan. Ganis subsequently discovered that the boat designated as security for the loan had never been completely built. Ganis instituted a suit against the Jacksons in the United States District Court for the Central District of California and obtained a default judgment.

■ The Jacksons contend that the California court lacked personal jurisdiction over them and that therefore the California judgment is void. In an action where a federal court's jurisdiction is based on diversity of citizenship, a party's amenability to suit is determined by reference to the law of the state in which the federal court sits. *E.g. Thomas P. Gonzalez Corp. v. Consejo Nacional de Produccion de Costa Rica*, 614 F.2d 1247, 1250 (9th Cir.1980). California law therefore governs whether the California district court had personal jurisdiction over the Jacksons. California's long-arm statute provides: "A court of this state may exercise jurisdiction on any basis not inconsistent with the constitution of this state or of the United States." Cal. Code Civ.P. § 410.10. California and federal limits on the exercise of personal jurisdiction are therefore coextensive, and the question is whether the California district court's exercise of jurisdiction over the Jacksons complied with due process. *See Haisten v. Grass Valley Medical Reimbursement Fund*, 784 F.2d 1392, 1396 (9th Cir.1986).

■ Consistent with principles of due process, a court may exercise jurisdiction over a nonresident defendant as long as the defendant has sufficient minimum contacts with the forum state that maintenance of the suit does not offend " 'traditional notions of fair play and substantial justice.' " *International Shoe Co. v. Washington*, 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945). Even if a nonresident defendant's activities in a forum are not pervasive enough to justify the exercise of general jurisdiction over him, a forum may still exercise specific personal jurisdiction over a nonresident who purposefully directs his activities toward residents of the forum and the cause of action results from alleged injuries that arise out of or relate to those activities. *Burger King Corp. v. Rudzewicz*, — U.S. —, 105 S.Ct. 2174, 2182, 85 L.Ed.2d 528 (1985). Exercise of jurisdiction in such a case results from a state's interest in providing its residents with a convenient forum for redressing injuries inflicted by nonresidents. *Id.* 105 S.Ct. at 2183. It also reflects a sense that out-of-state individuals who derive econom-

---

2. Although Jackson did not directly pay Garfinkel a fee for his role in setting up the tax shelter investment, theirs was clearly a business relationship and it can be assumed that Garfinkel also expected to gain financially from some aspect of the deal.

ic benefit from their activites in a state should have to account for the consequences of their acts within that state. *Id.*

██ The nonresident defendant's activities in the forum state must be substantial enough, however, that he should have reasonably foreseen being haled into court there. *Id.* The defendant must have committed some act by which he purposefully availed himself "of the privilege of conducting activities within the forum [s]tate, thus invoking the benefits and protections of its laws." *Hanson v. Denckla,* 357 U.S. 235, 253, 78 S.Ct. 1228, 1239, 2 L.Ed.2d 1283 (1958). Personal jurisdiction over a nonresident defendant cannot result from merely random, fortuitous, or attenuated contacts, or from the unilateral activity of another party. *Burger King Corp. v. Rudzewicz,* 105 S.Ct. at 2183. With regard to contractual obligations, parties who have deliberately reached out beyond one state and created continuing obligations between themselves and citizens of another state, have availed themselves of the privilege of conducting business there. *Id.* at 2182. Such parties are shielded by the benefits and protections of that other forum's laws and are also "subject to regulation and sanctions in the other [s]tate for the consequences of their activities." *Id.* at 2182, 2184. As long as the defendant purposefully directed his business efforts toward the other state, the actual physical presence of the defendant in that state is not necessary. *Id.* at 2184. Moreover, if a substantial connection is made with the forum, even a single act can support jurisdiction. *Id.* at 2184 n. 18.

██ The mere existence, however, of a contract between a plaintiff and an out-of-state party is insufficient by itself to establish the minimum contacts with the plaintiff's forum necessary to warrant exercise of personal jurisdiction. *Id.* at 2185. To determine whether a contracting party is subject to jurisdiction in a forum, a court must evaluate the parties' prior negotiations, the parties' contemplated future contacts, the terms of the contract, and the parties' actual course of dealing. *Id.* at 2186. A choice of law provision in a contract, although not sufficient on its own to evoke jurisdiction, is evidence that a party has purposefully availed himself of the benefits and protections of the state whose law governs. *Id.* at 2187. *See also, Rice Growers Ass'n v. First Nat'l Bank,* 214 Cal.Rptr. 468, 475, 167 Cal.App.3d 559, 570 (1985) (choice of law of the forum in contract constitutes substantial contact). The forum-related activities of an agent[3] and a subagent are imputable to the principal and are counted as the principal's contacts for jurisdictional purposes. *Rice Growers,* 214 Cal.Rptr. at 477, 167 Cal.App.3d at 572. *See also Burger King Corp. v. Rudzewicz,* 105 S.Ct. at 2186 n. 22 (commercial activities carried on in behalf of an out-of-state party may be ascribed to that party); *Wells Fargo & Co. v. Wells Fargo Express Co.,* 556 F.2d 406, 419 (9th Cir.1977) (activities conducted on behest and under control of party are imputable to it). Another factor to consider is whether the nonresident defendant sought or obtained any economic benefit from his activities in the forum state. *See Sibley v. Superior Court of Los Angeles County,* 128 Cal.Rptr. 34, 37, 16 Cal.3d 442, 447, 546 P.2d 322, 325 (1976). Even when there is a "lesser" showing of minimum contacts, consideration of factors such as the burden on the defendant, the forum state's interest in adjudicating the dispute, the plaintiff's interest in obtaining effective and convenient relief, the interstate judicial system's interest in obtaining the most efficient resolution of controversies, and the shared interest of the states in furthering fundamental substantive social policies may establish the reasonableness of exercising jurisdiction. *Burger King Corp. v. Rudzewicz,* 105 S.Ct. at

---

**3.** An agent is "one who represents another, called the principal, in dealings with third persons." *DeSuza v. Andersack,* 133 Cal.Rptr. 920, 924, 63 Cal.App.3d 694, 699 (1976) *quoting* Cal. Civil Code § 2295. "Agency is the fiduciary relation which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act." Restatement (Second) of Agency § 1 (1958).

2184. The presence of these reasonableness factors may "balance out an otherwise insufficient showing of minimum contact." *Haisten v. Grass Valley Medical Reimbursement Fund*, 784 F.2d at 1400.

▮ The issue now before this Court, therefore, is whether the Jacksons had sufficient minimum contacts with California, concerning the boat loan made by Ganis, to support a finding that the California district court properly exercised personal jurisdiction over them, and also whether it was reasonable to do so. At the outset, it should be noted that the Jacksons clearly authorized Garfinkel to act on their behalf in finding the financing they needed to purchase a fishing boat as part of the tax shelter investment. The Jacksons retained control over Garfinkel's actions in the sense that they could agree or refuse to sign the final documents pertaining to the loan. I find that Garfinkel acted as the Jacksons' agent in this matter. By the same token, the facts show that Seagate acted on behalf of Garfinkel and thus, in effect, acted as a subagent for the Jacksons in procuring the loan. *See* Restatement (Second) of Agency § 5(1) (1958). Although the Jacksons did not have any direct contact with Seagate, they should have anticipated that Garfinkel would appoint or deal with someone else in seeking financing for the loan. The Jacksons were experienced borrowers and knew that Garfinkel was a tax lawyer, not a banker. Garfinkel thus had implied authority to appoint a subagent who would perform the steps necessary to procure the financing.

▮ Looking at the economic reality of the transaction, it is apparent that the Jacksons purposefully injected themselves into an out-of-state transaction, first with Garfinkel in Florida when they agreed to the tax shelter investment, and later with Ganis in California when they signed, not just one, but seven documents which clearly advised the Jacksons that they were borrowing money from a California corporation. It is not determinative that the Jacksons mailed the executed documents to Garfinkel in Florida rather than to Ganis itself in California. The Jacksons must have known that the documents would have to end up in California before the proceeds from the loan would be released and their transaction completed. Thus the Jacksons, through Garfinkel and Seagate, purposefully directed activities, which were of a business as opposed to a personal nature, toward a resident of California, Ganis.

In addition to the steps taken procuring the loan, the Note and Security Agreement also contain provisions which constitute contacts between the Jacksons and California. The Note provides that payments on the loan would be made in California. These payments were to be made over a period of five years, indicating that the parties anticipated a continuing, long-term relationship.[4] The Security Agreement provides that California law controls and that the agreement was signed in California. All of these factors represent minimum contacts between the Jacksons and California. *See, e.g., Fed. Nat'l Bank & Trust Co. of Shawnee v. Moon*, 412 F.Supp. 644, 647 (W.D.Okla.1976). Moreover, the Jacksons expected to obtain an economic benefit from the loan transaction with California in the form of a tax shelter, another factor to consider when evaluating a nonresident's contacts with a forum. *See, Sibley v. Superior Court of Los Angeles County*, 128 Cal.Rptr. at 37, 16 Cal.3d at 447, 546 P.2d at 325.

The Jacksons, as contracting parties, therefore purposefully established numerous contacts with California through the solicitation of the Ganis loan by their agent and subagent, the future anticipated contacts for five years in the form of loan payments, and the terms of the Note and Security Agreement. *See Burger King*

---

4. Although the Jacksons assert that Garfinkel was supposed to make the installment loan payments, Ganis was obviously not informed of this prior to the first late payment, and, under the terms of the Note, the Jacksons were, and are, the persons ultimately responsible for the payments.

*Corp. v. Rudzewicz,* 105 S.Ct. at 2186. The transaction thus had a substantial connection with California, and the Jacksons purposefully availed themselves of the privilege of conducting business in California. There is no element of surprise concerning the source of the loan money in this case. The Jacksons should have anticipated the possibility of suit in a California court if the loan was not repaid. For these reasons, I rule that the Jacksons had sufficient minimum contacts with California to warrant the exercise of personal jurisdiction over them in the California district court.

The question remains whether the California court's exercise of personal jurisdiction over the Jacksons was reasonable. Looking at the reasonableness factors enumerated in *Burger King Corp. v. Rudzewicz,* 105 S.Ct. at 2184, noted above, I rule that it was reasonable for the California court to exercise personal jurisdiction over both defendants. Considering modern means of transportation and communication, and the nature of the suit, the burden on the Jacksons of defending the action in California was not substantial. *See McGee v. International Life Ins. Co.,* 355 U.S. 220, 222–23, 78 S.Ct. 199, 200–01, 2 L.Ed.2d 223 (1957). On the other hand, California has an interest in providing its resident lenders with an effective means for enforcing loan agreements. *See id.* at 223, 78 S.Ct. at 201. Lenders such as Ganis would be at a severe disadvantage if they were forced to follow each borrower in default to a foreign state. *See id.* In today's world, where interstate and international commercial transactions are common, the most efficient resolution of controversies often requires nonresident parties who conduct business with parties in another state to litigate disputes in that other state. Here, the Jacksons purposefully sought and engaged in a business or commercial transaction with a California resident and it is

reasonable that disputes over the loan be decided in California.

Considering the extent of the contacts the Jacksons had with California concerning the loan from Ganis, and the reasonableness of asserting jurisdiction in California, I rule that the United States District Court for the Central District of California had jurisdiction over the defendants in this action.

Order accordingly.